Charles CRISSMAN; Wendy Crissman; *Christine Crissman, Appellants,

v.

**DOVER DOWNS ENTERTAINMENT INC.; Dover Downs, Inc.**

(9th Cir.2001); *Afolayan v. INS*, 219 F.3d 784, 789 (8th Cir.2000); *Angel–Ramos v. Reno*, 227 F.3d 942, 948–49 (7th Cir.2000)).

* (Dismissed as Party per Court's 11/8/2000 Order)

No. 00–5178.

United States Court of Appeals, Third Circuit.

Filed: April 30, 2002.
Originally Argued: Dec. 5, 2000.
Reargued En Banc: Nov. 28, 2001.

Noel E. Primos, Jeffrey J. Clark [Argued], Schmittinger & Rodriguez, Dover,

DE, for Appellants, Charles Crissman, Wendy Crissman.

Thomas P. Preston [Argued], Reed Smith, Wilmington, DE, for Appellees, Dover Downs Entertainment Inc., Dover Downs, Inc.

James F. Burnett, Potter, Anderson & Corroon, Wilmington, DE, for Amicus-Appellees, Thoroughbred Racing Associations of North America, Inc., DE Racing Assoc.

Frederick J. Martin, Bleakley, Platt & Schmidt, White Plains, NY, for Amicus-Appellees, Harness Tracks of America.

BEFORE: McKEE, ROSENN and CUDAHY,** Circuit Judges.

· BEFORE: BECKER, Chief Judge, SLOVITER, MANSMANN,*** SCIRICA, NYGAARD, ALITO, McKEE, RENDELL, BARRY, FUENTES, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

We are called upon in this appeal to determine whether the exclusion of Charles and Wendy Crissman from Dover Downs race track was fairly attributable to the state of Delaware. The Crissmans argue that Dover Downs and the state were in a "symbiotic relationship" such that Dover Downs acted under color of state law based on the Supreme Court's reasoning in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6

L.Ed.2d 45 (1961). The District Court held that there was no state action and granted Dover Downs' motion for summary judgment. A panel of this court reversed, but on rehearing en banc, we conclude that the regulation and flow of funds involved here do not equate to the facts in *Burton* and do not otherwise support a conclusion that the state is responsible for the Crissmans' exclusion.[1] Accordingly, we will affirm the District Court.

### I.

Our jurisdiction is clear under 28 U.S.C. § 1291, and our review of the District Court's grant of summary judgment is plenary, *e.g.*, *Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir.1999). We apply the same legal standard as the District Court did, determining whether there is a genuine issue as to any material fact, while viewing the facts and inferences from them in the light most favorable to the Crissmans. *Id.*; Fed.R.Civ.P. 56. If the Crissmans have failed to make a showing sufficient to establish the existence of state action, Dover Downs is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II.

Although little is straightforward in determining whether a private actor has acted "under color of state law,"[2] one di-

---

** Honorable Richard D. Cudahy, Senior Judge, United States Court of Appeals for Seventh Circuit, sitting by designation.

*** The Honorable Carol Los Marismann participated in the argument and conference of the en banc court in this appeal, but she died before the filing of the opinion.

1. The panel opinion, later vacated by this Court, appears at 239 F.3d 357 (3d Cir.2001).

2. Where a defendant's conduct is state action under the Fourteenth Amendment, it is also conduct "under color of state law" for § 1983. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n. 2, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Because the difference is not significant here, we use the two phrases interchangeably. *See Groman v. Township of*

rective emerges clearly from the Supreme Court's jurisprudence: the facts are crucial. In *Burton*'s often-quoted words, "[o]nly by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." *Burton*, 365 U.S. at 722, 81 S.Ct. 856. Accordingly, we will begin with a discussion of the facts pertaining to the conduct at issue, namely, the exclusion of the Crissmans from the Dover Downs race track; then we will explore the relationship between the Crissmans and Dover Downs and the nature of the involvement of the state of Delaware.

A. The Crissmans and Dover Downs

Charles and Wendy Crissman live in Delaware and own and train horses. They make their living exclusively from harness racing, and have done so for many years, at least since the late 1970s or early 1980s. In order to participate in racing in Delaware, they are licensed by the Harness Racing Commission of Delaware (the "Commission" or "Harness Racing Commission"), which is part of the state's Department of Agriculture. 3 DEL.C. § 10002. We know little else from the record about the Crissmans.

Dover Downs, Inc., is a private corporation that owns and operates a harness racing facility in Dover, Delaware, where, until 1997, the Crissmans raced their horses. The corporation is a subsidiary of Dover Downs Entertainment, Inc., which apparently has other interests in hotels and NASCAR racing, but which is not named in this suit. Dover Downs is one of two state-licensed harness racing tracks in Delaware, each of which runs races for

half the year. Although excluded from Dover Downs, the Crissmans continue to race at the other track, Harrington Raceway. The Crissmans do not dispute that Dover Downs' facilities were privately built on private land, and are privately owned.

Dover Downs is not only a state-licensed harness racing association, as defined by the harness racing regulations, but is also a state-licensed "video lottery agent." The three lottery agents in Delaware—Dover Downs, Harrington Raceway, and a thoroughbred track—have both racing and video lottery machines (also called video slot machines or "slots"). The video lottery machines were added to the existing harness racing track in 1994 as a separately managed operation. Both activities are subject to extensive regulation by the state.

The general manager of harness racing for Dover Downs, Charles Lockhart, runs the day-to-day operations of Dover Downs' racing facilities and recommended the exclusion of the Crissmans to Dover Downs' president. Lockhart became the general manager on October 20, 1997, only days before he decided to exclude the Crissmans from the harness racing track. A letter was sent to each of the Crissmans—dated October 27, 1997—informing them that they could no longer race at Dover Downs. The one-sentence letter, which was signed by the president of Dover Downs after discussions with Lockhart, stated: "[A]s of this date you are not welcome on the premises of Dover Downs nor will Dover Downs be accepting any horses owned or trained by you." The race track refused to explain this exclusion.[3] Despite the Crissmans' repeated

*Manalapan,* 47 F.3d 628, 638 n. 15 (3d Cir. 1995).

**3.** A letter sent by Dover Downs' General Counsel to the Crissmans' lawyer in October

1999 stated that "we choose not to debate the merits of our decisions with regard to our right to exclude individuals from our facility."

requests to allow them access, the exclusion continued through the 1997–1998 and 1998–1999 seasons.

Lockhart indicated in his deposition testimony that he excluded the Crissmans because of rumors of licensing denials, doping, and financial irresponsibility, as well as rumors that the Harness Racing Commission was investigating Charles Crissman for false ownership in connection with Delaware-only races. These races, limited to horses wholly owned by Delaware residents or sired by Delaware stallions, were introduced by the race track in the early to mid–1990s, and the rules governing eligibility were formalized in 1998, *see* 3 DEL.C. § 10032. The rules or policies that govern these Delaware-only races could be circumvented through "false ownership"—where the formal owner (presumably a Delaware resident) is not the "true" owner (presumably *not* a Delaware resident). These races make up about five of the thirteen daily races.

Lockhart had heard all of these rumors before beginning his employment with Dover Downs. From 1973 to 1997, Lockhart had worked for an association of harness horse owners, trainers, breeders and drivers. It was in that capacity that he first met Charles Crissman in the late 1970s or early 1980s. Because of Lockhart's position in the association, horsemen came to him with complaints, including complaints that Charles Crissman was circumventing the Delaware-only racing policies and that he had misrepresented horses that he sold.

There is no evidence in the record that the state authorities were involved in any way in the exclusion. It so happened that Lockhart had known Robert Collison, the

Harness Racing Commission investigator who was looking into the claims of false ownership, for fifteen or twenty years and had discussed Charles Crissman's alleged misconduct with him before Lockhart began working at the race track. Lockhart himself acknowledged that he had two conversations with Collison about the investigation while Lockhart was employed by Dover Downs, but both of them took place after the Crissmans had been excluded. There was no evidence of any interaction between Lockhart and Collison—and thus between Dover Downs and the state—in connection with the decision to exclude, or the exclusion of, the Crissmans.

B. Involvement of the State of Delaware

The state of Delaware has consistently taken the position that the decision to exclude the Crissmans was Dover Downs' alone. In February 1999, Delaware's Department of Justice sent the Crissmans a letter (seemingly in response to a request for some action or intervention on its part) stating that the Commission can only request that racing licensees provide the state with a list of excluded people, and that the Commission's licensing power "does not supersede the common law right of a track to exclude individuals for lawful grounds."[4] It directed the Crissmans to take up their complaints with the track.

In fact, the Crissmans acknowledged at oral argument that the state had no "direct" involvement in Dover Downs' conduct, arguing instead that state regulation and the flow of funds between Dover Downs and the state by virtue of the video lottery operation made their exclusion "fairly attributable to the state." Both the

---

4. A Commission regulation specifically provides: "An association may eject or exclude a person for any lawful reason. An association shall immediately notify the State Steward and the Commission in writing of any person ejected or excluded by the association." Delaware Harness Racing Commission Rules and Regulations ("Commission Rules"), ch. IV, IV.E.

harness racing and the slot machines are heavily regulated, as is true in most states where gambling or racing are permitted.

The statute establishing the Harness Racing Commission gives it power to promulgate regulations regarding harness racing operations. These are detailed in their provisions, reaching such aspects of racing as the videotaping systems to be used, the appropriate surface for the race track, and even the colors to be worn by the various starting-gate positions. Delaware Harness Racing Commission Rules and Regulations ("Commission Rules"), ch. IV, III. C, D, H.

The regulations subject certain race track personnel to regulatory approval. Horse owners and trainers, race track owners, and various officials must be licensed by the state, and some of the employees' positions are defined by the Commission Rules. *See, e.g.,* 3 DEL.C. § 10023. Nonetheless, Dover Downs pays, supervises, and is in charge of hiring decisions and, generally, decisions to fire employees. There are a few exceptions. Some judges may be paid by the state, which is then reimbursed by the track, and the state veterinarian is state-appointed, Commission Rules, ch. III, XII.A.1. But neither has a role in managing the track's operations; the judges oversee the fairness of the races and the state veterinarian evaluates the horses' health. Commission Rules, ch. III, XII.A.3. Moreover, there can be no involvement going the other way; no one with an official relationship to a harness racing association can be an employee of the Commission. 3 DEL.C. § 10007.

The Commission has reserved for itself numerous rights and powers, including the right to regulate admission charges, approve changes to a track's buildings, compel production of books or other documents showing a track's receipts and disbursements, require removal of any of the track's employees or officials, place expert accountants in the track's offices to ensure compliance, and issue subpoenas for the attendance of witnesses and production of documents before the Commission. 3 DEL.C. § 10029. While comprehensive from a regulatory standpoint, these regulations stop short of giving the state any interest or role in the day to day operations of Dover Downs or its decision-making as to how it runs its business.[5]

The state regulations also reflect the state's concern for the finances of harness racing associations like Dover Downs, in that the associations are subject to audits by the Commission and must periodically submit financial statements. 3 DEL.C. §§ 10029(e); 10030; Commission Rules, ch. IV, II.B. The Commission can enforce these measures through several of the special powers it has reserved—particularly the power to place an accountant in a licensee's office, *see* 3 DEL.C. § 10029(e)— and, presumably, through its power to suspend or revoke licenses, 3 DEL.C. § 10026.

---

5. The regulatory scheme governing racing is similar to Pennsylvania's, which we had the opportunity to consider in *Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589 (3d Cir.1979), where we held that "the State's relationship to the heavily regulated racing industry [was] not sufficient to establish a symbiotic relationship under *Burton.*" *Id.* at 596. The scheme there included detailed regulations, licensing of officials and description of their job duties, state approval of officers and even stockholders of private racing associations, a substantial state financial interest in tax revenue, as well as a rule calling for the track to "enforce" Racing Commission Rules. Ultimately we found state action because racing officials, who were privately paid but had authority from the Commission to oversee the races, had participated in the decision to expel a trainer from the track. But the regulatory scheme in itself did not make the action "fairly attributable to the state." *Id.*

Nonetheless, Dover Downs makes its own independent fiscal decisions.

The horse racing regulations are only one aspect of the state's relationship with Dover Downs, of course, and we agree with the panel opinion that Dover Downs' video lottery and racing activities should be considered together. Whereas the state has been involved in the regulation of horse racing for some time,[6] state licensing of video lottery at horse tracks is a fairly recent development.[7] It was first permitted in Delaware upon the passage in 1993 of an act known as the "Horse Racing Redevelopment Act" (the "Act"), which had as its stated purpose the revitalization of the horse racing industry in Delaware. 69 Del.Laws 446. The video lottery machines were introduced in 1994 and were limited to existing tracks. *See* 29 DEL.C. § 4819(a).[8] Dover Downs and Harrington Raceway are permitted to house video lottery machines and to become "agents" only because they were racing tracks in existence when the Act was passed. Further, when Dover Downs chose to become a video lottery agent, its racing activities became subject to certain additional restrictions—video lottery agents are required, for instance, to conduct more days of harness racing than they did before the

passage of the Act, and to increase the number of employees. *See* 3 DEL.C. § 10148(1).

Like harness racing, the video lottery is subject to detailed regulations. These include licensing requirements and certain restrictions on the lottery agents, such as caps on the number of machines that can be at any one location. 29 DEL.C. § 4820. The machines, which the state purchases, or in some instances leases, from the manufacturers, are connected to a central state computer, but are housed and operated on private property. *See* 29 DEL.C. §§ 4819(c), 4820 (licensees submit a proposed plan for obtaining video lottery machines but the state lottery director actually leases or purchases them from the manufacturers).

Statutory provisions also govern the handling of proceeds.[9] A portion of the video lottery proceeds flows directly to the track's racing operation as purse enhancements. 29 DEL.C. § 4815(b)(3)b; 3 DEL.C. § 10048(2). Even racing tracks that are not video lottery agents receive funds from the video lottery, provided that they maintain a certain purse size and number of racing days. 29 DEL.C. § 4821. In addition to this subsidy, Dover Downs acts essentially like a government contractor—

---

**6.** Several of the provisions of the statute regulating harness racing in Delaware date back to 1945. *See* 45 Del.Laws 303 (1945).

**7.** Similar legislation exists in a few other states. *See, e.g.,* W.VA.CODE § 29–22A–2 (2001) (authorizing video lottery machines at horse or dog tracks); S.D. CODIFIED LAWS § 42–7A (2001) (establishing a video lottery business under the direction of an independent state agency). Amici curiae, the Thoroughbred Racing Associations of North America and Delaware Racing Association, suggest that such an arrangement is under consideration in several more states.

**8.** The statutory provisions governing the video lottery were added to an existing statute,

which permitted a state lottery and described its mechanisms, including the duties of the director of the state lottery to "operate and administer" the lottery, as well as to promulgate rules and regulations. 29 DEL.C. § 4805(a).

**9.** *See* 29 DEL.C. § 4815. Parts of this section were revised in 1997, but the changes do not affect our analysis. The revised statute allocates funds to jockey organizations and the Delaware Standardbred Breeder's Program, and instead of the video lottery agents' reimbursing the state for equipment costs, these costs are paid out of funds allocated to the state. *See* 29 DEL.C. § 4815(b)(3) (2001).

the state pays Dover Downs a commission for housing and operating the slots. 29 DEL.C. § 4815.

The funds also flow in the other direction, as the state receives a portion of the video lottery proceeds. Indeed, raising money for the state is what makes the lottery permissible under the Delaware Constitution, which generally prohibits gambling, but makes an exception for lotteries "under State control" designed to raise money for the state. DEL. CONST. § 17. The revenues from the slot machines—minus the money won by players—go to a state fund, from which money is paid out as dictated by statute. *See* 29 DEL.C. § 4815. In addition to the payments to the racing tracks described above, funds flow to the state to reimburse it for administrative costs, to organizations that help compulsive gamblers, and to the state's general fund. *See id.* The revenues coming to the state of Delaware from the video lottery operation have been quite significant—in 1997, video lottery contributions to the state general fund were $152.3 million and Dover Downs earned $90.13 million, while the next year they earned $206 and $113.12 million, respectively.

Factually, then, the Crissmans complain of an act by an employee of a privately owned race track in which the state was, undisputedly, not directly involved. However, Dover Downs acknowledges that its harness racing and video lottery activities are subject to extensive state regulation, and both the track and the state receive funds from the operation of the video lottery machines. It is the characterization of the relationship formed by these ele-ments that is at the heart of the disagreement between the parties.

## III.

After having been excluded from Dover Downs for two seasons, and on the day before the 1999–2000 season began, the Crissmans filed a complaint in federal district court in Delaware. They made a claim under § 1983 that Dover Downs' exclusion of them without a hearing violated their Fourteenth Amendment Due Process rights. A necessary element of this claim was that Dover Downs had violated these rights while acting "under color of state law." 42 U.S.C. § 1983.

The District Court invited and then considered further evidence specifically on the state action issue before granting Dover Downs' motion for summary judgment on the ground that the Crissmans had not sufficiently shown this element.[10] *Crissman v. Dover Downs, Inc.*, 83 F.Supp.2d 450, 453, 455 (D.Del.2000). The Court concluded that state regulation and receipt of revenue did not make this privately owned harness racing facility a state actor under the test urged by the Crissmans, namely the "symbiotic relationship" test first announced by the Supreme Court in *Burton. Id.* at 454. Further, it found no evidence that state officials participated in the decision to exclude the Crissmans. *Id.* at 455. That is, it found no evidence of a "close nexus" between the state and the conduct, which could establish state action under *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

The Crissmans filed a timely appeal of this decision. A panel of this Court re-

---

**10.** Dover Downs filed a cross-motion for summary judgment in response to the Crissmans' motion for a preliminary injunction. The District Court's decision on the summary judgment motion resolved both. The parties agreed that the record for the motions would consist of a stipulation of undisputed facts and the items presented as the record at the preliminary injunction hearing.

versed the District Court's grant of summary judgment for Dover Downs based on its view that the track did have a "symbiotic relationship" with the state of Delaware. *Crissman v. Dover Downs Entm't Inc.,* 239 F.3d 357, 358 (3d Cir.2001). The panel reasoned that *Burton* established an exception to the general rule that the state must be involved in the challenged conduct, and that *Burton* permitted state action to be based on the facts here, namely, facts demonstrating what it termed "overall involvement of the State in the affairs of the private entity." *Id.* at 361. This was the first opinion in which we applied *Burton* to find state action since 1984, and one of only a few to reach that conclusion without a finding that the entity involved was an "instrumentality" of the state.[11] Interestingly, the Supreme Court's most recent pronouncement in the area of state action does not reference *Burton,* and the scope of *Burton,* and its applicability here, presents an important issue. We vacated the panel opinion so that this issue could be considered by the entire Court.

## IV.

▓ The basic question we must ask, and answer, in the state action arena is whether the exclusion of the Crissmans from Dover Downs can be fairly attributed to the state. *See, e.g., American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). The Supreme Court has established a number of approaches to this general question, which it has recently said are essentially "facts that can bear on the fairness of such an attribution." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Regardless of whether these are "tests" or "facts," [12] *Brentwood* directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to "assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Id.* at 295, 121 S.Ct. 924 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis in original)).

The Crissmans rely primarily on the "symbiotic relationship test" the Supreme Court announced in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Alternatively, but clearly less vigorously, they assert that state action here could also be based on the "close nexus" between the challenged action and the state, which we will discuss below. First we will address *Burton,* its relationship to the general state action inquiry, its scope, and how its facts compare to those before us here.

### A. *Burton*

In *Burton,* a restaurant located in the Wilmington Parking Authority, a state-

---

**11.** Most of our cases finding state action under *Burton* date from the 1970s and involved universities and libraries. *See Krynicky v. University of Pittsburgh,* 742 F.2d 94 (3d Cir. 1984) (University of Pittsburgh and Temple University); *Benner v. Oswald,* 592 F.2d 174 (3d Cir.1979) (Pennsylvania State University); *Chalfant v. Wilmington Inst.,* 574 F.2d 739 (3d Cir.1978) (en banc) (library); *Braden v. University of Pittsburgh,* 552 F.2d 948 (3d Cir.1977) (en banc) (University of Pittsburgh); *Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382 (3d Cir.1976) (library).

**12.** The Supreme Court pointed out in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), that it has never been clear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation." *Id.* at 939, 102 S.Ct. 2744; *see also Groman v. Township of Manalapan,* 47 F.3d 628, 639 n. 16 (3d Cir.1995). *Brentwood* seems to embrace the second understanding.

owned parking facility, refused to serve a customer because of his race. The Court concluded that this discriminatory conduct was state action. The state's parking facility was highly dependent on the revenue from the leases—nearly 70% of the funds necessary to pay the financing for the facility came from leases, while only 30% came from parking revenue. Patrons of the state's activity (parking) benefitted from the lessee's activity (restaurant services). And the activity complained of—the discriminatory service of restaurant patrons—was the source of revenue needed for the state's operation of the project: "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Burton*, 365 U.S. at 724, 81 S.Ct. 856.[13]

Moreover, the restaurant was on publicly owned land and was located within the exterior walls of a public parking garage. Signs on the garage indicated that the building as a whole was public, and the Supreme Court concluded that the state had "elected to place its power, property and prestige behind the admitted discrimination." *Id.* at 719, 725, 81 S.Ct. 856. The physical location of the restaurant involved the state further in its operations: any improvements the restaurant made to the building would be tax exempt and the state was responsible for physical maintenance and provision of utilities. The Court held that the "symbiosis"—close association of mutual benefit—dictated a finding of state action.

We must consider at the outset the panel's view that *Burton* contains an exception to the principle that the state must have been implicated in the conduct complained of. Justice Souter's recent blanket state-

ment in *Brentwood* seems to leave no room for such an exception. There, he stated categorically that in order to determine whether an action is fairly attributed to the state, we must look at the challenged conduct: "state action may be found *if, though only if,* there is such a 'close nexus *between the State and the challenged action*' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood,* 531 U.S. at 295, 121 S.Ct. 924 (emphasis added).

In *Burton,* the Supreme Court characterized *the conduct* as bearing a very significant relationship to the state: "[T]he profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Burton,* 365 U.S. at 724, 81 S.Ct. 856; *see also Rendell–Baker v. Kohn,* 457 U.S. 830, 843, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (emphasizing the role this fact played in the outcome of *Burton* ). By referring in general terms to *Burton*'s "joint participation test," courts often forget that *Burton* concluded that there the state was "recognized as a joint participant *in the challenged activity,*" and not in the private entity as a whole. *Burton,* 365 U.S. at 725, 81 S.Ct. 856; *see also id.* at 724, 81 S.Ct. 856 (concluding that all of the activities "indicate[ ] that degree of *state participation and involvement in discriminatory action* which it was the design of the Fourteenth Amendment to condemn" (emphasis added)).

▮ Accordingly, we conclude that *Burton* stands for the proposition that, if a "symbiotic" relationship does exist, then, by virtue of the close involvement of the state and interdependence of the actors in

---

**13.** The conclusion that the state benefitted was based in part on the restaurant's assertion that serving African–Americans would hurt its business. *See Burton,* 365 U.S. at 724, 81 S.Ct. 856.

the association formed and the challenged activity, the conduct complained of is in fact "fairly attributable" to the state. Instead of examining the conduct and, then, the state's role in it, *Burton* would have us look first at the relationship and test whether the conduct could be linked to the joint beneficial activities—as it was in *Burton* due to the essential revenues flowing from the discriminatory restaurant operation. We view *Burton*, then, not as an exception to the rule that the conduct complained of must be fairly attributable to the state, but, rather, as providing another vantage point or way of assessing the necessary connection to the state.

## B. *Burton*'s Scope

How, and whether, we then apply *Burton* depends on the extent to which its principles still control our analysis. The Supreme Court has had occasion in the more than 40 years since *Burton* was decided to consider state action in no less than a dozen cases, and while referring to and characterizing the *Burton* "test" in

several opinions, the Supreme Court has never relied upon it again to find state action. Nor, however, has it overruled it.[14]

The Court itself, and several of the Justices, have noted the narrow reach of *Burton*. In *American Manufacturers Mutual Insurance v. Sullivan*, 526 U.S. 40, 57, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), seven Justices opined that "*Burton* was one of our early cases dealing with 'state action' under the Fourteenth Amendment, and later cases have refined the vague 'joint participation' test embodied in that case."[15] Further, in *American Manufacturers*, the Supreme Court reversed our court's determination that private insurers became state actors by providing benefits under the extensively regulated and state-controlled workers' compensation system, admonishing our court for having "figuratively thrown up its hands and fallen back on language in our decision in *Burton*." *Id.*

And, curiously, in its most recent pronouncement in *Brentwood*, the Supreme Court reviewed the extensive litany of

**14.** As the Supreme Court has directed, "it is this Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). There, it stated that the court of appeals was correct to apply the relevant Supreme Court decision despite what the court of appeals described as the case's "infirmities, [and] its increasingly wobbly, moth-eaten foundations." *Id.*

**15.** *See also NCAA v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (explaining that there is state action under *Burton* where the state "knowingly accepts the benefits derived from unconstitutional behavior").

*Justice O'Connor* has written two dissenting opinions indicating *Burton*'s narrow scope. In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), she wrote:

Our decision in *Burton* ... was quite narrow. We recognized "the limits of our inquiry" and emphasized that our decision depended on the "peculiar facts [and] circumstances present." ... We have since noted that *Burton* limited its "actual holding to lessees of public property," *Jackson v. Metropolitan Edison Co.*, [419 U.S. at 358, 95 S.Ct. 449,] and our recent decisions in this area have led commentators to doubt its continuing vitality....

*Id.* at 409, 115 S.Ct. 961 (O'Connor, J., dissenting). Similarly, in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), she questioned "the continuing vitality of *Burton* beyond its facts" and noted that "the decision in [*Burton* ] depended on the perceived symbiotic relationship between a restaurant and the state parking authority from whom it leased space in a public building" and that "the State stood to profit from the restaurant's discrimination." *Id.* at 636, 111 S.Ct. 2077 (O'Connor, J., dissenting).

"facts" that bear on whether there is state action, but did not reference *Burton*. Justice Souter wrote:

[A] challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum [v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)], when the State provides "significant encouragement, either overt or covert," *ibid.*, or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar [v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)] (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) (per curiam), when it has been delegated a public function by the State, *cf., e.g., West v. Atkins*, [487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)]; *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–628, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), when it is "entwined with governmental policies," or when government is "entwined in [its] management or control," *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

*Brentwood*, 531 U.S. at 296, 121 S.Ct. 924. Notably absent is any reference to the "symbiotic relationship test," or to *Burton*. In fact, *Burton* is never mentioned in the majority opinion.[16]

The fact remains, however, that *Burton* has not been overruled, nor its reasoning discredited by the Supreme Court in the text of any opinion, despite numerous opportunities. Because the full range of Supreme Court precedent that now guides our analysis appears to narrow, but not to overrule, *Burton*, we must conclude that, while *Burton* remains good law, it was crafted for the unique set of facts presented, and we will not expand its reach beyond facts that replicate what was before the Court in *Burton*.

C. Application of *Burton*

■ Given the thrust of recent Supreme Court precedent, and given the fact pattern presented by the operation before us, the conduct complained of, and the regulatory scheme, we cannot conclude that the state and Dover Downs had a "symbiotic relationship" as existed in *Burton* such that the exclusion of the Crissmans could be found to be fairly attributable to the state of Delaware. Unlike the state in *Burton*, Delaware was not conducting any operation together with the race track at Dover Downs. It was not operating a mutually beneficial business there. Rather, it licensed Dover Downs to operate as a

16. "The Crissmans point to the use of the word "symbiosis" in footnote four in *Brentwood* as evidence that the Court still embraces the *Burton* "test," despite the fact that the majority does not cite to *Burton* or expound on the theory. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 301 n. 4, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). But the footnote pertains to an unrelated point, the rejection of formalism in determining state action, and "symbiosis" arises only as an example of a criterion that looks to underlying reality. In the footnote, the majority's only reference to "symbiosis" is as a criterion of state action "which the dissenters accept," which could be said to imply that the majority *does not* accept it. The dissenting Justices did, in fact, cite *Burton* and include the "symbiotic relationship test" among the approaches they discussed and applied. They found no state action under *Burton* because the private entity acted as a contractor and the state did not profit from the challenged activity." *Id.* at 935, 939 (Thomas, J., dissenting).

harness racing track and as a video lottery agent, it regulated both operations, it authorized the use of video lottery proceeds to subsidize harness racing, it paid Dover Downs a commission for housing and operating the video lottery machines, and it received funds from the video lottery operation.

Although some public property was involved, since the slot machines were owned or leased by the state, the conduct did not take place on state property as in *Burton*, so that there is no basis for finding that the state was in any way putting its support behind the conduct of the private entity. *See, e.g., Gannett Satellite Info. Network, Inc. v. Berger*, 894 F.2d 61, 67 (3d Cir.1990) ("The fact that the [newspaper] concessionaires lease their premises from a governmental entity also falls short of triggering state action. . . . In such circumstances, state action will be recognized only when there is a 'symbiotic' relationship between the private and governmental entities, such that the public might reasonably conclude from that relationship that the government has lent its support to the private entity's actions.").

In fact, the type of state-private relationship present here seems more analogous to the fact patterns involved in cases that have addressed whether government regulation and funding convert private action to state action. The Supreme Court made clear early in its state action jurisprudence that state licensing was not enough to make a private entity a state actor, *see Moose Lodge v. Irvis*, 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and the Court has repeatedly opined that regulation—even detailed regulation, as we have here—does not equate to state action, *see, e.g., Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (a heavily regulated utility company was not a state actor).

The Supreme Court has stated with equal force that the flow of funds does not implicate the state in private activity. The state of Delaware subsidizes harness racing by using some of the revenue from the video lottery, but it is clear that "[t]he Government may subsidize private entities without assuming constitutional responsibility for their actions." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). Here, the state also pays Dover Downs a substantial commission for housing and operating the video lottery, but, as the Supreme Court directed in *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), neither the fact nor the size of this commission makes Dover Downs anything more than a private contractor that performs a service. In *Rendell–Baker*, a privately operated school that treated students with special needs received at least 90% of its operating budget from the state. *Id.* at 843, 102 S.Ct. 2764. Nonetheless, the Supreme Court characterized the school's "fiscal relationship with the State" as "not different from that of many contractors performing services for the government." *Id.; see also Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business."). And, the use of the term "agent" does not change this reasoning. *Brentwood* directs us to look to reality rather than form, and Dover Downs does not function as a traditional agent, who could, for instance, bind the state.

Under the regulatory scheme here, the state does benefit from the proceeds of the video lottery. The Supreme Court has had little opportunity to address the impact on the state action inquiry of the flow of funds in this direction, as most cases have involved the flow of money *from* the state *to* private entities. This is not surprising, for it would be a radical concept if the state's receipt of funds from private actors were to convert them into state actors. If this were the case, the state's receipt of tax revenue from a private entity's operations would qualify most corporations as federal actors, which is surely not a desirable result. *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 803 (3d Cir. 2001).

While the Court's ruling in *Burton* did turn to some extent on the state's receipt of and need for the restaurant revenue, we submit that its fact pattern was unique and must be so limited. There, the state would not have been able to finance or pay for the parking facility absent the restaurant's lease, the demand for its parking was potentially increased by the restaurant's presence, and, as noted above, it financially benefitted directly from the specific discriminatory conduct.

As government's contractual involvement and interaction with private industry in so many ways is not only the norm today, but indeed arguably on the rise, if a financially advantageous contractual relationship providing revenue to the state were enough to make a private entity a state actor, it would tip the careful balance between preserving "an area of individual freedom" and "assuring that constitutional standards are invoked" when the state is responsible for the conduct at issue. *Brentwood*, 531 U.S. at 295, 121 S.Ct. 924.

In sum, the presence of both these elements—regulation and flow of funds—that are separately unpersuasive in the state action inquiry does not amount to more than each alone; the combination brings no greater result—namely, no state action.[17] Delaware is not associated in the harness racing or video lottery operation, nor are the monies that flow to the state tied in any way to the conduct the Crissmans complain of. The deeper involve-

---

**17.** This is consistent with the conclusion of most courts of appeals, including our court, that the conduct of employees of state-regulated race tracks is not state action absent a showing of a direct connection between the state and the specific conduct at issue. In *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3d Cir.1979), we held that Pennsylvania's regulatory scheme did not make the action of a race track "fairly attributable to the state," although we ultimately found that this was state action based on the direct involvement of racing officials in the conduct. We compared the case to *Jackson* and *Moose Lodge*, and concluded that the state was not a "joint venturer" with the track such that every act of the track could be said to be an act of the state. *Id.* at 596. *See also Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1082 (2d Cir.1990) (exclusion of a harness racehorse driver was not state action under *Burton* where the state had no proprietary interest in the track and did not have a "neighboring, interlinked business, and consequently lack[ed] as direct a financial stake in [the track's] success as was present in *Burton*"); *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221, 226 (5th Cir.1984) (denial of stall space was state action because of regulation *combined with* direct participation of a racing official in the decision); *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir.1983) (exclusion of a harness race driver was not state action where there was extensive regulation and revenue to the state but no evidence that the state participated in the conduct); *Fulton v. Hecht*, 545 F.2d 540, 542–43 (5th Cir.1977) (failure to renew contract to race greyhounds was not state action despite the state's role in auditing the track's books and issuing licenses and permits, the extensive revenue to the state, the presence of a state veterinarian at the track, and the fact that the track was the only one available during one-third of the year).

ment and "interdependence" present in a unique way in the fact pattern considered in *Burton* simply are not present here.[18]

### D. Third Circuit State Action Jurisprudence

We find nothing in our own jurisprudence regarding state action or *Burton* that would require a different analysis or result. At the same time that the Supreme Court has been developing the law in this area, we have written many opinions of our own focusing on state action, and have referenced *Burton* perhaps more than other courts (and definitely more than the Supreme Court). But, like the Supreme Court in its jurisprudence, we originally noted the presence of *Burton* as a test, but have gradually come to appreciate its limitations.

We have revisited *Burton* periodically as the Supreme Court's state action jurisprudence has evolved. When faced with the question whether *Burton* survived the announcement of the "close nexus test" in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), we concluded that it remained a viable framework. *See Braden v. University of Pittsburgh*, 552 F.2d 948, 957–58 (3d Cir.1977) (en banc). We reached the same conclusion in *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 98–99 (3d Cir. 1984), after the Supreme Court decided the so-called *Lugar* trilogy, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102

S.Ct. 2744, 73 L.Ed.2d 482 (1982), *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). But *Krynicky* and *Braden* have limited relevance to the situation here, not only because both predate the Supreme Court's most recent pronouncements, but also because they involved universities that we held to be "instrumentalities" of the state—factually and statutorily. We also held that the state was "deeply enmeshed in operations of the University" including "its financing and its basic decision-making processes," *Braden*, 552 F.2d at 959, and that the state had taken the affirmative step of "statutorily accepting responsibility for these institutions," *Krynicky*, 742 F.2d at 102, neither of which is the case here.

We have consistently noted the fact-specific nature of the "involvement and interdependence" present in *Burton*. *Boyle v. Governor's Veterans Outreach & Assistance Ctr.*, 925 F.2d 71, 76 (3d Cir.1991). In *Boyle*, we characterized *Burton* as depending on the fact that "the state had many obligations and responsibilities regarding the operation of the restaurant; mutual benefits were conferred; and the restaurant operated physically and financially 'as an integral part of a public building devoted to a public parking service.'" *Id.* Two years later, in *Black v. Indiana Area School District*, 985 F.2d 707 (3d Cir.1993), we took a slightly narrower

---

**18.** Our dissenting colleagues argue "tests"—joint venture and partnership—never specifically espoused by the Supreme Court as "tests" for state action. They do so based upon language in *Moose Lodge v. Irvis* to the effect that certain facts did not make the state a partner in any real sense. However, we do not take this reference as establishing that every partnership or venture with the state will result in a finding of state action. Rather, any relationship formed would have to be tested against the attributes found to be hall-

marks of state action in cases such as *Burton*. Thus, even if called by another name, the relationship must permit one to conclude that the action is fairly attributable to the state. Even if the Supreme Court were to espouse affirmatively a state action theory of joint venture or partnership (which does not seem to "fit" given the concept of joint and several liability and the sufficiency of other tests to accomplish the same result), we do not view the facts here as implicating the state in the exclusion of the Crissmans.

view, noting that *Burton* "turned on" the facts listed in *Boyle* and, further, that the profits from the discriminatory conduct were "indispensable" to the finances of a government agency. *Id.* at 711.

And, in our most recent pronouncement in the area of state action, we voiced our doubts as to *Burton*'s continued force. In *Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d Cir.2001), we were called upon to decide whether tobacco companies were government actors. Calling *Burton* "seminal, albeit somewhat idiosyncratic," we noted that the government's and the cigarette manufacturers' relationship—forged by beneficial revenue and by labeling regulations—did not constitute the "interdependence" necessary under *Burton. Id.* at 803. We stated:

> Virtually all enterprises are subject to tax collection and, to varying degrees, to regimes of administrative regulation; were these attributes enough to satisfy the test of *Burton,* substantially all businesses in the country would effectively become federal actors.... Moreover, although *Burton* retains much of its precedential value, it should be noted that the Supreme Court has recently cast some degree of doubt upon that decision.

*Id.* Thus, our own jurisprudence is quite consistent with the limited applicability of *Burton* to its facts—facts not present here.

E.   Other Bases for State Action

■   In the absence of facts equating to those present in *Burton,* the Crissmans still could show that their exclusion was fairly attributable to the state if the situation were to "fit" within one of the other approaches or "tests." They argue that the "close nexus" test applies. We disagree.

The Crissmans conceded at oral argument that the state had no "direct" involvement in the action, but they nonethe-

less urged the "close nexus" argument in their briefs and maintained at oral argument that it applies here. They argued that "the state has delegated sufficient authority to Dover Downs to make Dover Downs an agent of the state" and that "Dover Downs' exclusive authority over racing activity for six months each year" establishes the required nexus.

The Crissmans theorize that their exclusion was, in effect, a decision that they were ineligible for Delaware-only races for the six months of the year during which Dover Downs was the only harness racing track in operation. So, they urge, the Commission effectively delegated to the race track its power to determine eligibility, *see* 3 DEL.C. § 10032(e), making Dover Downs a state actor. But this argument is without merit. The Crissmans challenge their exclusion from the track itself and from *all* of the races, not only from those with limited eligibility. Further, they do not allege that any decision *about their eligibility* —whether they were or were not Delaware residents, for instance—violated their Due Process rights. *Cf. Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1084 (2d Cir.1990) (rejecting the argument that a track was a "monopoly" so that its exclusion of a horse owner was a de facto license revocation by the state). Moreover, the section of the statute the Crissmans rely on—3 DEL.C. § 10032—became effective in July 1998, after the initial decision to exclude them.

The Crissmans advance a second argument based on the fact that Dover Downs is the only race track in operation for six months of the year. They contend that since the Commission has the power to designate the days a harness racing track can operate, *see* 3 DEL.C. § 10023(c), it had granted the track a "six-month monopoly." This argument relies on the Supreme Court's suggestion in *Jackson v. Metropol-*

*itan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), that conduct of "a heavily regulated [business] with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics." *Id.* at 453. But *Jackson* itself then proceeded to ask whether the conduct was fairly attributable to the state. *Id.* Even if Dover Downs had a "six-month monopoly," this would not alter our conclusion that, for the reasons given above, the state can not be said to be responsible for the Crissmans' exclusion. Indeed, *Jackson* reached the same result—no state action. *See also Fulton v. Hecht,* 545 F.2d 540, 543 (5th Cir.1977) (rejecting the argument that state action was present because the dog track was "granted a monopoly one-third of the year").

In their opposition to Dover Downs' petition for rehearing, the Crissmans also pointed to the Commission Rule that provides that an association "shall abide by and *enforce* the Act and the rules and orders of the Commission" as involving Dover Downs in the state enforcement activity. Commission Rules, ch. 5, I.1 (emphasis added). The panel opinion termed Dover Downs "an executive arm" of the Commission, and, thus, of the state of Delaware, on the ground that this rule delegated to Dover Downs a power traditionally associated with sovereignty. *Crissman v. Dover Downs Entm't Inc.,* 239 F.3d 357, 362 (3d Cir.2001) (quoting *Jackson,* 419 U.S. 345, 352–53, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ("If we were dealing with the exercise by [the utility] of some power

delegated to it by the State which is traditionally associated with sovereignty . . . . our case would be quite a different one.")). But we are unpersuaded by a single provision in the context of all of the other facts we have noted indicating that the exclusion was not fairly attributable to the state. Moreover, a sensible reading of the verb "enforce" in this context would be "to oversee compliance," rather than "to enforce" in the sense of actual policing or active governmental or official "enforcement" of rules and regulations.[19] This reading is consistent with our conclusion in *Fitzgerald v. Mountain Laurel Racing,* 607 F.2d 589 (3d Cir.1979), that the Pennsylvania racing scheme, which contained a similar "enforcement" provision, did not make a track's conduct state action.

In sum, there is no evidence of a close nexus between the exclusion of the Crissmans and the state of Delaware. Further, the Crissmans have not argued, or demonstrated, that their exclusion was state action under any other of the "tests" or "facts" established by the Supreme Court.[20]

## V.

For the reasons above, we conclude that the District Court appropriately granted summary judgment in favor of Dover Downs, and we will accordingly AFFIRM.

ROSENN, Circuit Judge, dissenting.

In 1993, Delaware departed from its role as solely a regulatory body of the three horse racing tracks in the state and decided to mount joint enterprises with each of

---

**19.** In fact, the rule has since been amended so that "abide by and enforce" is replaced with "comply with." 5 Del. Register of Regs. § 3.2.4 (Oct. 1, 2001).

**20.** Because we will affirm the grant of summary judgment on the basis of the state action

issue, we need not reach the question of whether a constitutional right was denied. Also, given our ruling, we do not need to address the Crissmans' request that we reverse the District Court's denial of their motion for a preliminary injunction.

them. Therefore, the expulsion without a hearing of the Crissmans, "licensees in good standing with the Harness Racing Commission for the State of Delaware,"[1] after about twenty-five years as horse trainers and horse owners at the Dover Downs race track fairly may be attributed to the State under 42 U.S.C. § 1983.[2] I, therefore, respectfully dissent.

## I.

The courts have never succeeded in formulating and applying a precise test for the recognition of state action under the Equal Protection Clause. In "sifting [the] facts and weighing [the] circumstances," *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the entrepreneurial involvement of the State in the formerly private operations of Dover Downs is evident. Fortunately, the facts are transparent and undisputed.

The majority concludes that the regulations and flow of funds do not equate to the facts in *Burton* and do not otherwise support the exclusion of the Crissmans from the Dover Downs race track as "fairly attributable to the state of Delaware." (Maj. op. at 233). The majority is correct that the facts do not equate to *Burton*. The facts here are not only distinct from *Burton* but far more impressively support state action.

Dover Downs attempts to portray a relationship with the State at the time the Crissmans were expelled as simply regulatory. I agree that a regulatory relationship alone clearly is insufficient to constitute state action. The Supreme Court so

held in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and we have so held in *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 596 (1979). Nonetheless, we noted in *Fitzgerald* that:

> Where a private enterprise stands, in its operations, as a veritable partner with the state, then it seems proper to hold such enterprise subject to the same constitutional requirements to which the state is accountable.

*Id.* at 595 (quoting *Braden v. Univ. of Pittsburgh (Braden II)*, 552 F.2d 948, 958 (1977)).

Similarly, in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Supreme Court in essence held that extensive and detailed regulation of a private club generally is insufficient to convert it into a state actor. *Id.* at 176–77, 92 S.Ct. 1965. The Supreme Court, however, also observed that although the Moose Lodge was heavily regulated, it could not be said to be "a partner or even a joint venturer in the club's enterprise," *id.* at 177, 92 S.Ct. 1965, thus implying that a partnership, or even a joint venture relationship between the State and a private enterprise, as we have here, might bring different consequences.

In this case, the record demonstrates that when Delaware enacted the Horse Racing Redevelopment Act (HRRA) in 1993 to rejuvenate a declining state horse-racing industry and, at the same time, enhance its own revenues, it augmented its regulatory relationship. The State and Dover Downs became joint entrepreneurs

---

**1.** Paragraph 2, Stipulation of Undisputed Facts.

**2.** 42 U.S.C. § 1983 provides: "Every person who, under color of any … regulation … of any State … subjects, or causes to be subjected, any citizen of the United States … to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or any other proper proceeding for redress."

in a lottery and race track enterprise. The slot machines used by Dover Downs were the property of, or leased by, the State, not Dover Downs. The State exercised control over the slot machines by directly connecting them to the central computer system at the State Lottery Office. To this enterprise, the race track contributed its race track premises, its infrastructure, its organization, and its operating capital. In this joint enterprise fashioned and molded by the State, the State acts in a business capacity, not as a regulatory force. Dover Downs is a licensed state lottery agent.

The record also reflects that the state joint video lottery is inextricably linked with harness-racing. The State of Delaware's avowed purpose in creating the video lottery was to provide "assistance in the form of increased economic activity and vitality for Delaware's harness and thoroughbred horse racing industries, which activity and vitality will ... cause increased employment." 29 Del.Code Ann. tit. 29, § 4801(b)(1). Under Delaware law, Dover Downs would not be permitted to operate a video lottery if it did not conduct harness racing meets. *Id.* § 4819(a).

Another purpose of the state-created lottery was to establish a joint venture with state race tracks to provide Delaware with additional income. To effectuate this purpose, Delaware shares a portion of the lottery's revenue with Dover Downs to be applied to Dover Downs's harness racing purses under the direction of the Harness Racing Commission. *Id.* § 4815(b)(3)b.2. Thus, the recipients of harness racing purses are direct beneficiaries of money derived from the video lotteries jointly operated by the State and the race track.

Furthermore, the State and Dover Downs also share jointly, although not equally, in the earnings generated by the video lottery.

Because of the entrepreneurial relationship that Delaware has established with Dover Downs, the State stands to gain and indeed receives substantial revenue. The direct stake of Delaware in the financial arrangements it established in 1993 with its race tracks is undisputed.

Finally, it must be noted that the State of Delaware is involved in Dover Downs' harness racing activities. There are many positions that Dover Downs is not permitted to fill without State approval. The Harness Racing Commission requires no fewer than 14 harness racing officials to be licensed [3] and it reserves the right to designate other positions that require licenses. Although Dover Downs pays and supervises these officials, the Commission's rules describe their duties and responsibilities in detail. Most importantly, the Commission's rules require Dover Downs not only to abide by, but also to *enforce* the [Harness Racing] Act and the rules and orders of the Commission." (emphasis added).

In *Jackson,* the Supreme Court stated that the petitioner's case for state action would have been stronger if the private actor had "exercise[d] ... some power delegated to it by the State which is traditionally associated with sovereignty." 419 U.S. at 352–53, 95 S.Ct. 449. The power to enforce laws is one such power, the delegation of which renders Dover Downs an arm of the Commission. Of course, heavy state regulation of a private entity alone does not necessarily give rise to a joint venture relationship. However, the undisputed

---

**3.** The following individuals must be licensed by the HRC: state steward, board of judges, racing secretary, paddock judge, horse identifier and equipment checker, clerk of the course, official starter, official charter, official timer, photo finish technician, patrol judge, program director, State veterinarian, and LA-SIX veterinarian. (App. at 59).

facts here show a deliberate entwining and interdependence between the State and Dover Downs, not only in the operation of the State Lottery but also in the harness racing operations at the track. Since 1993, the State's concerns for the "economic activity and vitality" of the racetrack operation is a matter of statutory expression. The overall involvement of the State in the race track's affairs is manifest.

The majority analyzes the *Burton* rationale and concludes, especially in light of the Supreme Court decision in *Brentwood*, decided after the District Court's opinion and panel opinion in this case, that *Burton* must be limited to its unique facts. I find no fault with such limitations, especially since the *Brentwood* court carefully refrained from citing *Burton*. However, the facts in this case bear no resemblance to *Burton*. This is a much stronger case for the fair attribution of state action than was the case in *Burton*. Here, we have a joint venture of the State and Dover Downs in the operation of the video lottery and the harness racing track, not merely a symbiotic relationship.

This court has defined a joint venture as "an association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." *Richardson v. Walsh Constr. Co.*, 334 F.2d 334, 336 (3d Cir. 1964). The *Richardson* court further described the essential elements of a joint venture as: "(a) a joint proprietary interest in, and a right to mutual control over, the enterprise; (b) a contribution by each of the parties of capital, materials, services or knowledge; and (c) a right to participate in the expected profits." *Id.* A joint venture relationship may exist where parties engage in an undertaking without entering upon their business undertaking "as strict partners, but engage in a common enterprise for their mutual benefit." *First*

*Mechs. Bank v. Comm'r of Internal Revenue*, 91 F.2d 275, 278 (3d Cir.1937); *accord Plant–Erickson v. Ditter*, 131 N.J. Eq. 163, 24 A.2d 379, 381 (1942). A modern definition of a joint venture and some of its incidents is set forth in the current edition of *Williston on Contracts:*

"A joint venture is a special combination of two or more persons, whether corporate, individual or otherwise, formed for some specific venture in which a profit is jointly sought without the parties designating themselves as an actual partnership or corporation. The essence of the contract among the joint venturers is that it binds the coventurers. While, as between the parties themselves, a contract is essential for the creation of a joint venture, this is not necessarily so as to third persons; although the parties may never have intended to become joint venturers, under certain circumstances, they may be held estopped to deny their participation in a joint venture, and all members of the joint venture will be held jointly and severally liable on its contracts."

12 Richard A. Lord, *Williston on Contracts* § 36:9 (4th ed.1999) (footnotes omitted). Thus, in *Tompkins v. Commissioner of Internal Revenue*, 97 F.2d 396 (4th Cir. 1938), the Court of Appeals applied essentially the same definition and held that an arrangement between a partnership and a corporation in a specific transaction constituted a joint venture between the partnership and the corporation. The court concluded that the agreement between the partnership and corporation "fulfilled all the requisites of a joint venture although informal and [ ] never reduced to writing." *Id.* at 399.

In *Irvis*, the Supreme Court observed that although Pennsylvania engaged in extreme and detailed regulation of private clubs, this was insufficient to make the

Moose Lodge a state actor. 407 U.S. at 177, 92 S.Ct. 1965. However, it intimated that had the relationship between the Lodge and the State been a partnership or joint venture, its decision would be different. *Id.* ("[The regulations cannot] be said to make the State . . . a partner or even a joint venturer.").

Similarly, in *Fitzgerald,* we did not find that the heavy state regulation of race tracks amounted to a symbiotic relationship between the race track and the state, but we noted that the result would have been different had the race track in its operations been a "veritable partner with the state." 607 F.2d at 595. Under such circumstances, "it seems proper to hold such enterprise subject to the same constitutional requirements to which the state is accountable." *Id.* (quoting *Braden,* 552 F.2d at 958). We have such a situation here.

The majority draws a comparison between *Fitzgerald* and this case. The only basis for comparison is that both involve horse harness racing activities that are state regulated. The majority notes that in *Fitzgerald* we concluded that the state was not a "joint venturer." However, *Fitzgerald* is vastly different from this case. *Fitzgerald* did not have slot machines; there was no sharing of profits; the track was not a state agent in the operation of the slot machines, in the collection of the proceeds and in transmitting them to the state; the state and the race track did not commit their separately owned property to the joint enterprise; the state did not use monies generated by the video lottery to cross-fertilize the horse racing activities; and there was no lottery and no joint venture.

The majority acknowledges "that Dover Downs' video lottery and racing activities should be considered together." (Maj. op. at 237). However, the majority ignores the financial structure created by the HRRA. The majority summarily concludes that "Delaware was not conducting any operation together with the race track at Dover Downs. It was not operating a mutually beneficial business there." (Maj. op. at 243). These conclusions are the backbone of the majority's decision but the facts and the HRRA are to the contrary.

Delaware transformed the regulatory structure of its relationship with Dover Downs in 1993 when it enacted the Horse Racing Redevelopment Act. One purpose of the Act is "to establish a state-operated lottery . . . which will produce the greatest income for the State." Del.Code Ann. tit. 29, § 4801(a). A second purpose is to provide *"nonstate supported assistance* in the form of increased economic activity and vitality for Delaware's harness and thoroughbred horse racing industries, which activity and vitality will enable the industry to improve its facilities and . . . cause increased employment." *Id.* § 801(b)(1) (emphasis added).

The HRRA authorizes harness race tracks such as Dover Downs to operate slot machines on their premises. As I have stated above, the race track provides its premises, infrastructure, and organization for the enterprise, and the State provides the slot machines. The race tracks, as "video lottery agents," are responsible for securing and operating the machines and are free to determine the number of machines they choose to house, up to the statutory maximum of 1000. *Id.* § 4820.

The HRRA also provides for the distribution of the profits generated by the race tracks in the operation of the slot machines. Dover Downs is required to send all monies generated by the machines, net of payments to patrons, to an account controlled by the State Lottery Office. *Id.* § 4815(b). The monies received by this account are then distributed in accordance

with the HRRA. First, the State pays the administrative costs associated with the operation of the lottery, including the salaries of state lottery personnel. Next, Gamblers Anonymous and similar programs receive a share. The State then splits the balance with Delaware race tracks, including Dover Downs. A large percentage of the remaining funds is distributed to racetracks such as Dover Downs "to be applied under the direction of the Delaware Thoroughbred Racing Commission for races conducted at such agent's racetrack." *Id.* § 4815(b)(3)b. Finally, Dover Downs, as a video lottery agent, receives a statutorily designated "commission." *Id.* § 4815(b)(3)c. The State general fund receives the most substantial share of the profits. The flow of funds from the race track to the State is generated by the business arrangement under the HRRA between Delaware and the race track, not by state regulation of the industry. The relationship established is one that was obviously "mutually beneficial" and "conducted together." The majority's assertion to the contrary has no record support.

Under Delaware law, an arrangement between two individuals and a corporation to which each party made a definite contribution to the enterprise, shared in the profits, and had a proprietary interest in the venture, constitutes a joint venture. *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 503 (Del.1959). The State and Dover Downs are joint venturers, a "widely recognized legal relationship ... of modern origin," *id.* at 502, in the operation of the race tracks.

More recently, in *In re McKinney–Ringham Corp.*, No. Civ.A. 15071, 1998 WL 118035 (Del.Ch. Feb.27, 1998), a Delaware court found a relationship between one general partner and six limited partnerships a joint venture because they shared a community of interest between the managing entity, a right of each party to share in any profits, and a duty to share in the losses of the entity. The majority in this case baldly states that "the state was in [no] way putting its support behind the conduct of the private entity." (Maj. op. at 243). This ignores HRRA legislation specifically devised to rejuvenate the horse racing industry and enhance the State's Treasury. Operating the video lottery was indeed "a mutually beneficial business." In 1997, the net proceeds generated by the slot machines were $298.1 million, of which Delaware received $152.3 million and Dover Downs received $90.13 million. In 1998, the net proceeds were $350.82 million, of which Delaware received $206 million and Dover Downs received $113.12 million. In the first ten months of 1999, the Delaware race tracks netted $351.67 million. With tens and hundreds of millions of dollars in proceeds raised annually by the State of Delaware and Dover Downs, they both enjoyed significant mutual benefits from the joint venture that enriched their coffers.

The majority's description of the financial arrangement between the State and the race tracks as a "subsidy" is inaccurate. This inaccuracy is highlighted by the HRRA which states that one of the purposes of the Act is to provide "nonstate supported assistance." *See ante* p. 251. A subsidy is a grant made by the government to any enterprise whose promotion is considered to be in the public interest. BLACK'S LAW DICTIONARY 1442 (7th ed.1999). Delaware did not grant funds here. The payment of the administration expenses and salaries, the charitable contributions, and the split between the race tracks and the State of the monies earned in the enterprise were profits, not subsidies. The funds generated by Dover Downs are therefore "earned," (maj. op. at 238) not subsidized. Nor is there any basis for the

majority's equivocal characterization of Dover Downs's relationship to the State "like a government contractor." (Maj. op. at 237).

In *Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir.1984), we again reviewed our decisions and recent decisions by the Supreme Court relating to state action. We concluded that *Braden* was still good law, that the Supreme Court had not developed a uniform test for ascertaining state action and had even questioned whether such a unitary test was possible. *Id.* at 98. As in *Braden*, we held that the University was "in name and in fact" an instrumentality of the State. *Id.* at 103.

The majority concludes that our decisions in *Krynicky* and *Braden* "have limited relevance" to this case. I disagree. The majority reaches its conclusion because these decisions predate the Supreme Court's most recent pronouncement and because they involved universities that we held to be "instrumentalities" of the state. (Maj. op. at 245). Essentially, the issue there, although in an academic ambience far removed from horse racing tracks, was whether the participation of a state in an otherwise private activity was so significant that the acts of the seemingly private enterprise should be considered state action. That is the issue before us except that in this instance the relationship has more of the characteristics of the partnership asserted by the Crissmans rather than a private entity acting as a state instrumentality.

The *Braden* court observed that *Burton* and *Jackson* stand as two separate models of state action analysis designed by the Supreme Court. 552 F.2d at 958. What emerges from *Braden* and *Krynicky* is another model for state action, "state instrumentalities." The cases stand for the proposition that where a private enterprise stands as a "veritable partner" with the state in the operation of an educational institution, the enterprise is subject to the same constitutional requirements as the state. *Brentwood Academy v. Tennessee Secondary School Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), is yet another model. The applicability of each approach "rest[s] on the type of setting which may be present." *Braden*, 552 F.2d at 958.

Summarizing, the State of Delaware and Dover Downs engaged in a joint enterprise as a result of the relationship structured between them by the HRRA. Delaware's participation in and the financial benefits it derives from the operations are so significant that the acts of this seemingly private enterprise must be deemed state action for the purposes of Section 1983. Therefore, even though the State did not participate in the decision to expel or exclude the Crissmans, its relationship to Dover Downs as a joint venturer subjects the act of expulsion to constitutional standards. Accordingly, I would reverse the District Court's grant of summary judgment and remand this case for trial.

II.

Finally, the Crissmans ask this court to reverse the District Court's denial of their motion for a preliminary injunction. A court ruling on a motion for a preliminary injunction must consider the following four factors:

> whether the movant has shown a reasonable probability of success on the merits;
>
> whether the movant will be irreparably injured by denial of the relief;
>
> whether granting preliminary relief will result in even greater harm to the nonmoving party; and
>
> whether granting the preliminary relief will be in the public interest.

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999) (quoting *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc)). We review the denial of a preliminary injunction only for "an abuse of discretion, a clear error of law, or a clear mistake on the facts." *Id.* (internal quotations omitted).

I believe the Crissmans have a reasonable chance of succeeding on the merits because the State and Dover Downs are joint venturers, and the substantial evidence presented by the Crissmans supports their claim that they were denied due process of law.

All of the above factors cut in favor of the Crissmans. The Crissmans have suffered irreparable harm due to the denial of the injunction "because the nature of harness racing is such that no adequate remedy exists at law to compensate [them] for losses to income and reputation sustained from an unlawful suspension." *Fitzgerald,* 607 F.2d at 601. There is no evidence that Dover Downs would be harmed if the Crissmans, who are licensees in good standing with the Delaware Harness Racing Commission, were allowed to race. Finally, there is no evidence that the public would be adversely affected if the Crissmans were reinstated at Dover Downs. Thus, the District Court's denial of the Crissmans' motion for preliminary injunctive relief should be reversed.

### III.

Accordingly, for the reasons set forth above, summary judgment in favor of Dover Downs, Inc. should be reversed and the case remanded to the District Court, with directions to grant plaintiffs' motion for preliminary injunctive relief, and for such further proceedings as are consistent with this opinion.

Judge MCKEE joins in this dissent.