NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0544n.06
Filed: August 2, 2007

Case No. 05-6607

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GARRETT REDMOND, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| THE JOCKEY CLUB; COMMONWEALTH | ) | UNITED STATES DISTRICT |
| OF KENTUCKY; KENTUCKY HORSE | ) | COURT FOR THE EASTERN |
| RACING AUTHORITY, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| ———————————————— | ) | |

BEFORE: BATCHELDER, CLAY, and ROGERS, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge.

> What's in a name? that which we call a rose
> By any other name would smell as sweet;
> So Romeo would, were he not Romeo call'd,
> Retain that dear perfection which he owes
> Without that title.
>
> WILLIAM SHAKESPEARE, ROMEO AND JULIET, act 2, sc. 2.

*What's in a name?* To Garrett Redmond, who desires to name his Thoroughbred race horse "Sally Hemings," *everything* is in the name. When the Jockey Club, acting on behalf of the Kentucky Horse Racing Authority (KHRA), denied his request to register his horse under that name, Mr. Redmond protested and eventually filed a 42 U.S.C. § 1983 action in federal court, alleging a violation of his rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution, and seeking both an injunction and money damages. Mr. Redmond also included a

pendant state law claim, alleging that the state of Kentucky, through the KHRA, had impermissibly delegated legislative authority to the Jockey Club, in violation of Kentucky's state constitution. The defendants moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion. We affirm the judgment, but dismiss on different grounds.

## I.

We relate the facts as they appear in Mr. Redmond's complaint and its attached exhibits. The Kentucky Horse Racing Authority (KHRA) is an independent state agency established by statute to "regulate the conduct of horse racing and pari-mutuel wagering on horse racing, and related activities within the Commonwealth of Kentucky." Ky. Rev. Stat. Ann. § 230.225(1). It has broad power over horse racing activities, including the "full authority to prescribe necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted." Ky. Rev. Stat. Ann. § 230.260(3). One such regulation, pertinent to this case, is that "[n]o horse shall be entered or raced in this state unless duly registered and named in the registry office of the Jockey Club in New York." 810 Ky. Admin. Regs. 1:012 (Sec. 1).[1] No Kentucky statute or regulation contains any further statement regarding the naming.

The Jockey Club is the sole organization that registers and maintains records of Thoroughbred horses in the United States, Canada, and Puerto Rico. It is a New York-based organization, established in 1894 and offering membership by invitation only, whose principal

---

[1]This provision also contains an exception to the requirement that horses must be registered and named in the Jockey Club registry, stating: "except, however, the stewards may for good cause, in their discretion, waive this requirement if the horse is otherwise correctly identified to the stewards' satisfaction." 810 Ky. Admin. Regs. 1:012 (Sec. 1). This exception is not at issue in the present case, however, as Mr. Redmond's complaint does not claim that he has ever, at any time during his extensive communications, requested the KHRA stewards to waive the requirement.

function is maintaining *The American Stud Book Principal Rules and Requirements*, which includes the universally-accepted rules and requirements for naming Thoroughbred horses. Rule 6(A) states that "names will be assigned based upon availability and compliance with the naming rules as stated herein." Rule 6(F) identifies classes of names that are *not eligible* for use, including:

Rule 6(F)(6): Names of persons, unless written permission to use their name is on file with the Jockey Club.

Rule 6(F)(7): Names of "famous" people no longer living, unless approval is granted by the Board of Stewards of the Jockey Club.

Rule 6(F)(8): Names of "notorious" people.

Rule 6(F)(13): Names that are suggestive or have a vulgar or obscene meaning; names considered in poor taste; or names that may be offensive to religious, political or ethnic groups.

Rule 6(G) gives the Jockey Club Registrar the absolute right to approve all name requests. Rule 20 provides the applicant the right to a hearing, upon payment of a $1,000 non-refundable fee.

When Mr. Redmond submitted the name "Sally Hemings" for his yearling filly in February 2004, the Jockey Club rejected it. A lengthy correspondence ensued, culminating in a telephone call in which the Jockey Club's president, Alan Marzelli, informed Mr. Redmond that the name is "in poor taste and may be offensive to religious, political or ethnic groups." Ultimately, Marzelli advised Mr. Redmond in writing that:

[T]he name 'Sally Hemings' is not eligible for use under Rule 6(F) of The Principal Rules and Requirements of *The American Stud Book* as the name is considered by this office to be in poor taste and a name that may be offensive to religious, political or ethnic groups (pursuant to Rule 6(F)(13)). Furthermore, and as you are aware, the name of a 'famous' person no longer living is not eligible under Rule 6(F)(7), unless approval is granted by the Board of Stewards of The Jockey Club.

Mr. Redmond appealed the decision to the Jockey Club Board of Stewards, objecting that it was arbitrary and unwarranted. The Board rejected Mr. Redmond's arguments on appeal and concluded

3

that the use of the name "may be offensive to persons of African descent and other ethnic groups, may be offensive to descendants of the specific people involved, may have negative historical implications, may have negative moral implications and may be degrading to ethnic groups and descendants of the people involved." The Board also rejected the name based on the prohibition against using the names of "famous person[s] no longer living."

In response, Mr. Redmond filed a seven-count complaint in federal court. The crux of Mr. Redmond's complaint (which he repeated at least four times) is that:

> *But for The Jockey Club's refusal to permit Mr. Redmond the use of the name 'Sally Hemings'* the Filly would be eligible to race in Thoroughbred races in Kentucky. Without the approval of The Jockey Club as to a name for the Filly, Mr. Redmond cannot race or breed the Filly nor can he thereby be eligible to obtain any purse that she might win and is without the opportunity to earn a livelihood through racing and breeding the Filly. The value of the Filly is negatively impacted by the inability to enter her into a Thoroughbred race. Mr. Redmond has a liberty and property interest in his right to name, race and breed the Filly in Kentucky.

Compl. at ¶¶ 37-39 (emphasis added); *also* ¶¶ 49-51, 57-59, 67-68. Otherwise stated:

> *As a result of the KHRA's actions to arbitrarily and capriciously deny Mr. Redmond the use of the name Sally Hemings* and thereby refuse to permit Mr. Redmond to race the Filly in Thoroughbred horse races in the Commonwealth of Kentucky, Mr. Redmond has suffered, and will continue to suffer immediate and irreparable harm for which, absent injunctive relief, there is no adequate remedy at law.

Compl. at ¶ 84 (emphasis added); *also* ¶ 81.

Thus, Mr. Redmond alleges that the Jockey Club (Counts 3 and 4 of his complaint) and the KHRA (Count 3) have violated the United States Constitution by denying his request to name and register his horse as "Sally Hemings," and that the irreparable nature of the resulting harm necessitates injunctive relief (Counts 6 and 7). Mr. Redmond asserts that the right to any name of

4

his choosing is protected by the First Amendment Free Speech Clause, the Fifth Amendment Takings Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.

Mr. Redmond's complaint also includes pendent state law claims alleging violations of Kentucky's state constitution. He claims that the Jockey Club's (and thereby KHRA's ) refusal to allow him to use the name "Sally Hemings" violates his due process, equal protection, and free speech rights under Sections 1, 2, 3, and 8 of the Kentucky Constitution (Count 2). He also claims that the KHRA's delegation of authority to the Jockey Club violates Sections 2 and 29 of the Kentucky Constitution (Counts 1 and 5).[2]

The defendants, Jockey Club and KHRA, moved the district court to dismiss the complaint and the court granted their motion. The district court dismissed Count 1 based on the conclusion that it is not "an unconstitutional delegation of authority for The Jockey Club to engage in the registration of Thoroughbreds." The court dismissed the remaining counts on the basis that the Jockey Club is not a state actor. Mr. Redmond appealed, contending that these decisions were in error.

## II.

Mr. Redmond appeals the district court's dismissal of his complaint for "failure state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). On appeal, we conduct a *de novo* review of the 12(b)(6) motion, *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 451 (6th Cir. 2003), employing the same standard as the district court: "a court considering a motion to dismiss under Rule 12(b)(6) must accept all well-pleaded factual allegations of the complaint as true and

---

[2]Based on the outcome of our analysis — from which we conclude that Mr. Redmond has failed to state a federal claim, and therefore grant the motion to dismiss the federal claims — we will exercise our discretion to deny supplemental jurisdiction over the pendent state law claims. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 1244-45 (2006). Therefore, we find that we need not consider the state law claims on the merits.

construe the complaint in the light most favorable to the plaintiff." *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005) (internal quotation marks and citations omitted). "Dismissal of the complaint is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quotation marks and citations omitted). Because we agree that Mr. Redmond has failed to state a claim on which relief can be granted, we affirm the dismissal, but we do so on different grounds than the district court because, in conducting our *de novo* review, we approach the analysis from a different direction.

The district court began by analyzing Mr. Redmond's claim that Kentucky had made an unconstitutional delegation of power to the Jockey Club, in violation of Sections 2 and 29 of the Kentucky Constitution. After a thorough review, the court concluded that: no legislative power had been delegated; without such delegation, the Jockey Club was not a "state actor" for purposes of claims brought under § 1983 or the state or federal constitutions; and, without state action, all of Mr. Redmond's claims for federal and state constitutional violations failed.[3]

We do not reach the question of whether Kentucky has delegated legislative authority to the Jockey Club in violation of its state constitution, or whether the Jockey Club's naming requirements amount to "state action" for purposes of Mr. Redmond's claims. Instead, we begin (and end) our analysis with our determination that, based on even our most liberal reading of his complaint, Mr. Redmond has not alleged facts that could demonstrate a violation of any right or interest protected under the United States Constitution. Accordingly, we conclude that "it is clear that no relief could

---

[3]Because Mr. Redmond's remaining state law issues could only be heard under the federal court's pendent jurisdiction, the district court did not err in dismissing these claims after determining that the federal claims could not survive the motion to dismiss. *See* note 2, *supra* (citing *Arbaugh*, 126 S. Ct. at 1244-45).

be granted under any set of facts that could be proved consistent with [Mr. Redmond's] allegations," and dismissal is proper under Rule 12(b)(6). *See Benzon*, 420 F.3d at 605.

## III.

"To state a claim under § 1983, a plaintiff must allege [1] the violation of [2] a right secured by the Constitution and laws of the United States, and must show [3] that the alleged violation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *accord Mezibov v. Allen*, 411 F.3d 712, 716-17 (6th Cir. 2005). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). It is the second element — that the right at issue is secured by the Constitution and laws of the United States — that we find lacking in the present case.

As the passages from the complaint make evident, Mr. Redmond is claiming a fundamental right to select any name of his choosing, or more specifically, a constitutional right to name and register his horse as "Sally Hemings." It is also evident from the complaint that neither KHRA nor the Jockey Club nor the rules and regulations Mr. Redmond cites in his complaint prevent Mr. Redmond from racing or breeding this horse, so long as the horse has a name that complies with the Jockey Club's rules. Therefore, the harms alleged by Mr. Redmond in the complaint (e.g., the horse's ineligibility to run as a Kentucky Thoroughbred, Mr. Redmond's inability to earn a livelihood through racing and breeding the horse, and the horse's diminished value) all derive from the denial of permission to use the name "Sally Hemings." Consequently, we must assume that it is only by allowing Mr. Redmond to so name the horse that his injuries might be redressed.

Mr. Redmond contends that the right to register his horse under any name of his choosing is protected by the Free Speech Clause of the First Amendment, the Takings Clause of the Fifth

Amendment, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Before proceeding to our individual consideration of each of these provisions, however, it is worthwhile to note that we have never recognized — nor have we found any authority that has ever recognized — a constitutional right to name a horse whatever one chooses, for any purpose whatsoever, let alone for the express purpose of registering the horse for competition. We can therefore say with some confidence that such a right would not be so securely established by the Constitution as to be considered "fundamental." *Cf.*, *e.g.*, *Powers v. Tiebauer*, 939 So.2d 749, 753-54 (Miss. 2005) (recognizing the unsettled debate as to whether a *parent* has a fundamental constitutional right to name his or her *child*) (citing cases). *Compare Jech v. Burch*, 466 F. Supp. 714, 719 (D.C. Haw. 1979) ("[P]arents have a common law right to give their child any name they wish, and [] the Fourteenth Amendment protects this right from arbitrary state action."), *with Brill v. Hedges*, 783 F. Supp. 333, 339 (S.D. Ohio 1991) (citing *Henne v. Wright*, 904 F.2d 1208, 1214 (8th Cir. 1990)) ("[W]hile parents have an important interest in naming their children, this interest does not rise to the level of a fundamental right."). If there is no unambiguous right for parents to bestow a name of their choosing upon their son or daughter, we have considerable doubt as to whether there is such a right for a horse owner to bestow a name of his choosing on his horse.

To be sure, the First Amendment protects horse owners' rights to free speech, and we do not foreclose Mr. Redmond indiscriminately from asserting that right, but the right to free speech is not absolute in all contexts. *See*, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 430 (1989); *United Public Workers v. Mitchell*, 330 U.S. 75, 95 (1947). The present context — that of the Jockey Club Thoroughbred naming registry[4] — is at most a "limited public forum." *See Rosenberger v. Rector*

---

[4]We will assume for purposes of this analysis that the Jockey Club, acting under the grant of authority by the KHRA by formal regulation, is a state actor, acting under the color of state law.

*& Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In such a limited public forum, the state may constitutionally restrict speech, so long as it does "not discriminate against speech on the basis of viewpoint," and the restriction is "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

In the present case, the purposes served by the forum (i.e., the Jockey Club registry) include — as set out in the *Principal Rules and Requirements* and quoted in the complaint — ensuring that the registered names are not those of living persons, names of famous people no longer living, names of notorious people, or "names that are suggestive or have a vulgar or obscene meaning; names considered in poor taste; or names that may be offensive to religious, political or ethnic groups." Thus, the restriction on the name "Sally Hemings" is reasonable in light of the purpose served by the forum and it does not discriminate on the basis of viewpoint. *See Good News Club*, 533 U.S. at 106-07. We conclude, as a matter of law, that Mr. Redmond cannot prove any facts consistent with the allegations in his complaint that would state a First Amendment claim. Let us emphasize, however, that this holding does not preclude — on a different record — the possibility of a plaintiff raising a viable First Amendment claim based on a state regulator's disallowance of a horse name.

The Takings Clause of the Fifth Amendment "provides that private property shall not be taken for public use, without just compensation; but it does not purport to define property rights." *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 1540 (2006) (Scalia, J., dissenting) (citations omitted). The Supreme Court has "consistently held that the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Id*. (quotations omitted). To establish a property interest in a particular benefit, such as a name, the plaintiff must have a "legitimate claim of entitlement to it." *Board of Regents*

*v. Roth*, 408 U.S. 564, 577 (1972). "[A]n abstract need or desire for it or a unilateral expectation is insufficient." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1108 (6th Cir. 1995).

Mr. Redmond claims a property interest in the horse itself, but he has not alleged and cannot allege that the defendants have deprived him of his horse or the use of his horse. Instead, Mr. Redmond asserts that they have deprived him of the use of the name, but Mr. Redmond has not pleaded any facts that would demonstrate that he has any legitimate claim to the name. At most, Mr. Redmond claims an abstract desire or unilateral expectation that the descendant of "Jefferson's Secret" and "A Colonial Affair" should race under the provocative name of "Sally Hemings." This is insufficient as a matter of law to state a property interest in that particular name, and therefore, Mr. Redmond can state no actionable Fifth Amendment claim consistent with the facts he has alleged.

Generally speaking, "[t]he Equal Protection Clause prohibits state and local governments from treating similarly situated persons differently." *Rector v. Denver*, 348 F.3d 935, 949 (10th Cir. 2003) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439-41 (1985)). "Unless a suspect class or fundamental right is implicated, a government's classification need only be rationally related to a legitimate government interest." *Id*. (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440.

Mr. Redmond protests that the Jockey Club's "denial of Mr. Redmond's right to use the name 'Sally Hemings' treats him differently and unfairly as compared to other Thoroughbred horse owners in Kentucky without rational basis." (Compl. ¶ 72). Despite this protest, however, we find that he has alleged no facts that might support an argument that the Jockey Club's regulations and rules, of

which he complains, or the actions taken pursuant to them, are not rationally related to a legitimate state interest, namely, the regulation of Thoroughbred racing in Kentucky. *See Rector*, 348 F.3d at 949. Accordingly, we conclude that his complaint is insufficient as a matter of law to state an actionable Equal Protection claim, based on the facts as alleged.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). A liberty interest is "an interest traditionally protected by our society . . . so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Michael H. v. Gerald D.*, 491 U.S. 110, 122 (1989) (plurality) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)). As we explained at the outset of this analysis, we have never recognized — nor have we found any authority that has ever recognized — a constitutional right to name a horse whatever one chooses, and we are confident that Mr. Redmond's interest in bestowing his horse with a provocative name is not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See id.* Therefore, Mr. Redmond has not pled facts that would state a liberty interest or a fundamental right to the particular, provocative name of "Sally Hemings," and Mr. Redmond has no actionable Due Process claim.

In short, because he has spent three years insisting that he has a constitutional right to name his horse "Sally Hemings" and that no other name will do, Mr. Redmond now finds himself, like the songster of the '70s, having "been through the desert on a horse with no name."[5] If he really wants to race or breed this horse in Kentucky, Mr. Redmond will have to come up with a name that

---

[5]Dewey Bunnell, *A Horse with No Name*, on AMERICA (Warner Brothers 1972).

complies with the Jockey Club's rules.[6]  A quick look at the Jockey Club's Registry confirms that

"Horse With No Name" is no longer available.[7]

**IV.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[6]We note from outside the present record that Mr. Redmond's four-year-old filly made her racing debut on July 1, 2007, under the *temporary* name "Awaiting Justice," finishing fifth in a nine-horse field.  *See* Churchill Downs Race Results, *available at* http://www.churchilldowns.com (last visited July 27, 2007); *see also* Jennie Rees, *Filly's Name is Some Affair*, Louisville (KY) Courier-Journal, June 30, 2007, available at http://www.courier-journal.com (quoting Mr. Redmond as saying the name is "strictly temporary") (last visited July 27, 2007).  Of course, the term "awaiting justice," being a temporary condition, would appear by its own implication to be necessarily temporary when used as a name.

[7]*See* The Jockey Club Registry, Online Names Book, *available at* http://www.registry.jockeyclub.com/ registry. cfm (last visited July 27, 2007).

**CLAY, Circuit Judge, concurring.** I write separately to address the question of state action. I would not so hastily set aside the question of state action in favor of exploring the constitutional violations Plaintiff alleged. The question carries import in this Circuit beyond the instant case, and the matter should at the very least be considered for three reasons. First, the district court disposed of Plaintiff's constitutional claims solely on the grounds that Defendant Jockey Club is not a state actor, and solely with reference to a previous decision of the Eastern District of Kentucky, which it considered controlling. Second, Plaintiff's arguments in his opening brief on appeal were addressed to the issue of state action, and not the viability of his constitutional claims. Third, and most importantly, the question of state action constitutes a question of threshold inquiry: Section 1983 provides a vehicle for challenging the deprivation of constitutional rights "under the color of" law, and the Constitution protects individual rights from invasion by the state. Having considered the issue, I would find that Defendant Jockey Club did not act "under color of" law for purposes of § 1983. With respect to Defendant KHRA, however, I conclude that state action is present.

The question whether state action exists is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982). "Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 234 (1961). Because this case comes before the Court on appeal from a Rule 12(b)(6) dismissal, the facts alleged by Plaintiff must be credited as true, and the complaint construed liberally. *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). Additionally, this Court may take judicial notice of state statutes and regulations where relevant. *See Val Decker Packing Co. v. Corn Prods. Sales Co.*, 411 F.2d 850, 852 (6th Cir. 1969) (citing *Lamar v. Micou*, 114 U.S. 218, 223 (1885)).

13

We should begin by setting forth the facts relevant to the question of state action, as drawn both from a favorable reading of Plaintiff's complaint and from a review of Kentucky law. Plaintiff, the owner and operator of a thoroughbred horse farm in Kentucky, breeds and races thoroughbred horses. (J.A. at 7) Defendant Kentucky Horse Racing Authority (hereinafter "KHRA") is an independent administrative agency of Kentucky responsible for regulating the conduct of horse racing and pari-mutuel wagering. (*Id*. at 7, 9; *see also* Ky. Rev. Stat. § 230.225(1)) KHRA consists of 13 members appointed by the Governor and one executive director. Ky. Rev. Stat. § 230.225(2). Kentucky law grants the KHRA the "full authority to prescribe necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted" in Kentucky. *Id*. at § 230.260(3).

Defendant The Jockey Club (hereinafter "Jockey Club") is a New York corporation licensed to do business in Kentucky, which was formed in 1894 "for the purpose of improving the breed of domestic animals." (J.A. at 7-8) In 1896, Defendant Jockey Club became "the exclusive organization for registering and maintaining records of Thoroughbred horses in the United States," and assumed the task of publishing the registry, *The American Stud Book*. (*Id*. at 8) Additionally, Defendant Jockey Club publishes *The American Stud Book Principal Rules and Requirements* (hereinafter "*Stud Book Rules*"), which sets forth controlling guidelines for naming thoroughbred horses. (*Id*.) Jockey Club abides by those rules in reviewing requests to register or change thoroughbred horse names. (*Id*.) By the terms of the Rules, Defendant Jockey Club's Registrar reserves the right to approve name requests. (*Id*. at 9)

Kentucky law defines "thoroughbred racing" with reference to Defendant Jockey Club. Specifically, "'thoroughbred racing' means a form of horse racing in which each horse participating

in the race is a thoroughbred (i.e., meeting the requirements of and registered with The Jockey Club of New York) and is mounted by a jockey." Ky. Rev. Stat. § 230.210(3). The regulations promulgated by KHRA require that a thoroughbred horse be "duly registered and named in the registry office of the Jockey Club in New York" before that horse can be entered or raced in a Kentucky thoroughbred race. 810 Ky. Admin. Regs. 1:012, §1. However, a limited exception permits entry into the race if "the stewards . . . for good cause, in their discretion, waive" the registration requirement, finding "the horse . . . otherwise correctly identified to the stewards' satisfaction." *Id*. As Plaintiff states in his complaint, neither Kentucky statute nor administrative regulations establish objective criteria for approving names for thoroughbred horses who seek to be registered with Defendant Jockey Club. Rather, by requiring thoroughbred horses to be registered with Defendant Jockey Club, KHRA effectively incorporates the *Stud Book Rules* as they pertain to naming thoroughbred horses. As a result, Plaintiff alleges, 8,596 Kentucky-born foals registered with Defendant Jockey Club in 2003, each at a cost of $200 payable to Defendant Jockey Club. (J.A. at 9) Mandatory registration fees for Kentucky-born foals alone thus yielded $1,719,200 in revenue to Defendant Jockey Club. (*Id*.) Plaintiff's complaint contains no factual allegations as to the Commonwealth of Kentucky's revenues from thoroughbred racing.

The challenged act in the instant case is Defendant Jockey Club's refusal to register Plaintiff's yearling filly (hereinafter "the Filly") with Plaintiff's requested name, "Sally Hemings," which had the alleged effect of excluding the Filly from Kentucky races. Although Defendant Jockey Club issued a Certificate of Foal Registration for the Filly and received its $200 mandatory registration fee, Defendant Jockey Club rejected Plaintiff's desired name. (J.A. at 10) Plaintiff persisted, and Defendant Jockey Club continually denied Plaintiff's requests to name the Filly "Sally

Hemings." (*Id*. at 11-13) Defendant Jockey Club referred Plaintiff to relevant provisions of the *Stud Book Rules* in support of these denials. (*Id*. at 11-13) Before Defendant Jockey Club's final determination, Plaintiff could have obtained a hearing before its Board of Stewards on the matter by paying a non-refundable fee of $1,000. (*Id*. at 13, 28) Plaintiff elected not to seek a hearing before Defendant Jockey Club. (*Id*. at 29) Rather, he filed a written objection with the Stewards, to no avail. (*Id*. at 29-34) No mechanism exists for appeal to the Commonwealth of Kentucky, the KHRA, or the courts of the Commonwealth.[8]

Over time, the Supreme Court has employed various tests to determine whether the conduct at issue is "fairly attributable to the state," as required by § 1983. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Of these, Plaintiff invokes the public function test and the close nexus test in support of his contention that Defendant Jockey Club acted under color of state law.[9] (Pl.'s Br. at 29-33) Although Plaintiff does not separately argue that Defendant KHRA constitutes a state actor, Plaintiff jointly named the Jockey Club and KHRA as Defendants, and alleged constitutional violations against Defendant KHRA. Accordingly, the question of state action on the part of Defendant KHRA is also before us for consideration. Initially though, this discussion will focus on the Jockey Club.

---

[8] Plaintiff's complaint does not allege that Plaintiff sought a discretionary waiver from Defendant KHRA's stewards to race the Filly without a name. *See* 810 Ky. Admin. Regs. 1:012, §1.

[9] It is somewhat less than clear from Plaintiff's brief whether he intended to invoke the close nexus test, or the symbiotic relationship test established in *Burton v. Wilmington Parking Auth*., 365 U.S. 715 (1961). In *Burton*, the privately owned restaurant responsible for the challenged discriminatory conduct leased public property, and existed in a state of mutually beneficial interdependence with the city. *Id*. at 723-76. *Burton* itself took pains to confine its holding to the facts then before it, *id*. at 725-26, and subsequent courts have followed suit. *See, e.g.*, *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175 (1972) ("Here there is nothing approaching the symbiotic relationship between lessor and lessee."); *Crissman v. Dover Downs Entm't Inc*., 289 F.3d 231, 242 (3d Cir. 2002) (en banc). At any rate, the Supreme Court has acknowledged that *Jackson v. Metro. Edison Co.* modified "the vague 'joint participation' test" of *Burton*. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 57 (1999). Thus, for purposes of this concurrence, I examine Plaintiff's claim under the close nexus test, and not the symbiotic relationship analysis.

Plaintiff first asserts that Defendant Jockey Club performed an "exclusive state function, the naming and registration of business." (Pl.'s Br. at 30) For support, Plaintiff points to provisions in the Kentucky code that regulate the registration and naming of Kentucky corporations. *See* Ky. Rev. Stat. § 271B.4-010 et seq. Of course, these provisions relate to *corporations*, and *not animals*. "The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Wolotsky*, 960 F.2d at 1335; *see also Marsh v. Alabama*, 326 U.S. 501 (1946); *Evans v. Newton*, 382 U.S. 296 (1966). Nothing alleged in Plaintiff's complaint, nor found in the laws and regulations of the Commonwealth, supports Plaintiff's contention that the power to approve or reject names for thoroughbred racing horses traditionally and exclusively belonged to the Commonwealth. Plaintiff's contention under this theory lacks merit.

Second, Plaintiff attempts to show a close nexus between Defendant Jockey Club and Defendant KHRA. The "close nexus" test considers whether "a sufficiently close nexus [exists] between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). However detailed and extensive, state regulation and licensing of a private entity unrelated to the challenged activity does not in and of itself transform wholly private conduct into state action. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176-77 (1972); *Jackson*, 419 U.S. at 350; *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Sullivan*, 526 U.S. at 52 ("Action taken by private entities with the mere approval or acquiescence of the State is not state action."). Nor does substantial state funding of the activities of a private entity convert that entity's actions into state action. *Blum*, 457 U.S. at 1011. Rather, "where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations' in order for the discriminatory action

17

to fall within the ambit of the constitutional prohibition." *Moose Lodge*, 407 U.S. at 173 (quoting *Reitman v. Mulkey*, 387 U.S. 369, 380 (1967)). That is to say, the state must be "intimately involved in the challenged private conduct" for that conduct to be attributed to the state. *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir. 1983).

Instructive cases in this Circuit and sister circuits examine the question whether private parties or entities involved in horse racing and dog racing constitute state actors for purposes of § 1983 suits. These cases militate against a finding of state action here. In this Circuit, *Bier v. Fleming*, 717 F.2d at 309-10, concerned a § 1983 suit brought to challenge an Ohio horse racing track's decision to ban the plaintiff, a harness race driver, from racing in two meets at the track. The plaintiff named both the Executive Secretary of Ohio's Racing Commission and the president of the race track as defendants. *Id*. at 309. Applying the nexus test, the court began by noting the private character of the race track and its president. *Id*. at 311. The court acknowledged that Ohio heavily regulates the horse racing industry, but found that "such extensive regulation does not, in itself, transform otherwise private actions into state action for purposes of § 1983." *Id*. Nor, in the court's view, did Ohio's receipt of revenue from racing convert the race track's private decision into state action. *Id*. The court characterized the state's involvement as "mere approval of or acquiescence in the initiatives of a private party . . . not sufficient to justify holding the State responsible." *Id*. (quoting *Blum*, 457 U.S. at 1004-05) (internal quotation marks and brackets omitted). Ultimately then, the *Bier* court concluded that the private horse racing track did not act "under color of" law. *Id*. at 310.

On two occasions, the Third Circuit has considered factually similar situations, reaching divergent outcomes each time. In *Fitzgerald v. Mountain Laurel Racing, Inc*., 607 F.2d 589, 591

(3d Cir. 1979), a private harness racing association expelled a trainer from its track purportedly for violating a state harness racing commission rule, and the trainer brought a § 1983 suit against the association. There, the private association's management met with the presiding racing judge and racing secretary to discuss previous consistent allegations against the trainer. *Id*. at 595. In the court's view, the racing judge and racing secretary possessed state-delegated authority to discipline the trainer for violations of the Racing Commission Rules. *Id*. Although the private association made the decision to expel the trainer, the racing secretary informed the trainer of that decision. *Id*. at 596.

The *Fitzgerald* court applied the "close nexus" test of *Jackson*, framing the key issue there as "whether the State participated in the challenged conduct itself by 'putting its weight' behind the challenged activity." *Id*. at 597. The court rejected the private association's claim that "its act of expelling [the trainer] derived solely from its common law property rights as lessor." *Id*. Rather, the court found that "whatever private rights were exerted were specifically linked to the enforcement of Racing Commission Rules." *Id*. at 598. The racing officials acted pursuant to their delegated authority when they opined that the trainer had violated the rules, and the private association cited a Commission Rule violation in expelling the trainer. *Id*. Because the private association lacked the power to enforce Commission Rules by itself, and because the racing officials "personally and actively participated in the specific conduct challenged," the *Fitzgerald* court concluded that the private association's expulsion of the trainer was state action. *Id*. at 598-99. The court cautioned that where the challenged private activity occurred absent the involvement of any state official, even where the activity purportedly enforces state law, no question of a close nexus would arise. *Id*. at 600.

This cautionary note foreshadowed the result in *Crissman v. Dover Downs Entertainment Inc.*, 289 F.3d 231 (3d Cir. 2002) (en banc). There, the plaintiffs owned and trained horses, which they raced in Delaware. *Id*. at 234. The plaintiffs filed a § 1983 suit against a privately owned and operated harness racing facility where their horses had previously raced when the facility expressly excluded them from future participation in races at that track. *Id*. Because the facility is one of only two state-licensed harness racing tracks in the state, the effect of excluding plaintiffs was to bar them from entering their horses in Delaware races for one-half of the year. *Id*. Although the state Harness Racing Commission licensed the facility, the record did not reflect Commission involvement in the decision to exclude plaintiffs from the facility. *Id*. at 235. Faced with the question of state action, the *Crissman* court reviewed the applicable statutory and regulatory scheme, and the flow of funds between the facility and the state. *Id*. at 235-38.

The court rejected the plaintiffs' argument under the "close nexus" test. The plaintiffs argued that the Commission "effectively delegated to the race track its power to determine eligibility," and essentially "granted the track a 'six-month monopoly.'" *Id*. at 246-47. The *Crissman* court reasoned that, while *Jackson* posited that "a heavily regulated business with at least something of a governmentally protected monopoly will more readily be found to be [a] 'state' act[or]," it also required that the conduct be fairly attributable to the state. *Id*. at 247 (quoting *Jackson*, 419 U.S. at 350-51) (alterations added and omitted). Although Delaware licensed and regulated the track, and received proceeds from horse racing and video lottery gaming at the track, the *Crissman* court found this state licensing, regulation and flow of funds insufficient to implicate Delaware in the track's otherwise private decision to exclude the plaintiffs. Because the Commission bore no responsibility for the exclusion, the court concluded that no state action had been shown. *Id*.

In *Fulton v. Hecht*, 545 F.2d 540, 540 (5th Cir. 1977), a greyhound breeder filed a § 1983 suit against a private kennel club's owners for refusing to renew his contract to race his dogs at the club. Although privately owned, the kennel club required a state license to conduct greyhound races. *Id.* at 541. The breeder claimed that the kennel club was a state actor since the state heavily regulated the dog racing industry, shared dog racing revenues, and allocated racing dates among the various private tracks. *Id.* at 542. The *Fulton* court, applying *Jackson*, found no state action. *Id.* Although the court agreed that the state extensively regulated the dog racing industry, the court stated that extensive regulation alone does not "make the state a partner in the endeavors of the Kennel Club." *Id.* What is more, the court observed that the state in no way partook in the decision not to renew the breeder's contract. *Id.* at 543. Consequently, the kennel club held not to be a state actor for purposes of § 1983.

The Fifth Circuit in *Bailey v. McCann*, 550 F.2d 1016, 1017 (5th Cir. 1977) concluded that the United States Trotting Association ("USTA") did not act under color of law, as required by § 1983, when it denied a harness trainer-driver's license to the plaintiff. The suit arose when the State of Florida denied plaintiff a state license to race allegedly because he did not possess a USTA license. *Id.* USTA, a private association, licenses harness racing drivers, receives no state funding, independently selects its own officers and directors, and is in no way regulated by the State of Florida. *Id.* at 1018. However, as a prerequisite to racing at a Florida harness racing track, all horses must be tattooed by the USTA and must possess an eligibility certificate from USTA. *Id.* Additionally, Florida's harness racing regulations require drivers to be licensed both by the Florida State Racing Commission and USTA before racing in the state. *Id.* Further, the Florida regulations

adopt USTA's rules and regulations for any and all situations not otherwise covered by the Florida rules. *Id.*

> In pertinent part, the *Bailey* court analyzed the issue as follows:

> . . . The fact that the State chooses to accord automatic weight to some of the defendant's decisions does not alone render those decisions state action. The State may at any time choose to do otherwise and adopt and use its own standards. The fact that the State requires a USTA license in order to race is no more significant than its requirement of a law degree from an approved school as a prerequisite for taking the bar examination. Such a requirement does not change the conduct of private law schools into state action.
>
> . . .
>
> . . . State adoption of the standards of a private organization as part of a State regulatory scheme which is not administered by that organization, is no more state action by that organization than is the adoption of State regulations by a wholly private organization.

*Id.* at 1019. Thus, the *Bailey* court found the USTA was not a state actor. *Id.*

In the case at bar, Plaintiff vigorously argues that "Kentucky, through its statutes and regulations, has essentially delegated to The Jockey Club the authority to determine what horses can race in Kentucky." (Pl.'s Br. at 31) Plaintiff claims that Kentucky "decided that certain qualifications are required of Thoroughbreds" and then allowed Defendant Jockey Club to define those qualifications. (*Id.* at 32) Plaintiff's argument fails on the facts alleged.

It cannot be gainsaid that the Commonwealth of Kentucky, by and through Defendant KHRA, extensively regulates the enterprise of thoroughbred racing. Kentucky empowers the KHRA with "full authority to prescribe necessary and reasonable administrative regulations" applicable to thoroughbred racing and pari-mutuel wagering. *See* Ky. Rev. Stat. § 230.260(3). With this broad authority, KHRA promulgated a rather detailed body of regulations that cover even seemingly trivial details, including registration and approval of racing colors, 810 Ky. Admin. Regs. 1:007, § 7, the

time a jockey must report prior to a scheduled race, *id*. at 1:009, § 11, and assignment of responsibility to a horse's trainer for maintaining clean and sanitary stable areas. *Id*. at 1:008, § 3. By way of example, horse owners and trainers must be licensed as a prerequisite to entering their thoroughbreds in a Kentucky race, and jockeys require a license to race. *Id*. at 1:007, § 1; 1:008, § 1; 1:009, § 2. The regulations impose certain duties and responsibilities for the care, health, and training of thoroughbreds on their trainers. *Id*. at 1:008, § 3. They require owners to disclose "the entire ownership of each horse in their care." *Id*. at 1:007, § 3. They even go so far as to require that the stewards approve of any contracts entered into between apprentice jockeys and horse owners or trainers. *Id*. at 1:009, § 4. KHRA additionally regulates permissible wagering systems, minimum wagers and payoffs, all the details of the race itself, and much more than require mentioning here. *Id*. at 1:011, §§ 1, 5; 1:015; 1:016. Further, the regulations set standards for the maintenance of private racing association grounds, including stables and start gates, lighting, stands for spectators, photo finish cameras, and so on. *Id*. at 1:026. All this is to say, the Commonwealth heavily regulates horse racing, down to the very last detail.

By its terms, the close nexus test laid forth in *Jackson* looks to the relationship between the state and "the challenged action of the *regulated entity*." *Jackson*, 419 U.S. at 351 (emphasis added). As the preceding discussion makes clear, the *enterprise of thoroughbred racing* is heavily regulated; *Defendant Jockey Club* is not. Were this a question of expulsion from a private racing association in the Commonwealth, as in *Bier*, *Fitzgerald*, *Crissman*, or *Fulton*, the private entity would be subject to the extensive and detailed state regulatory scheme. Yet, the Kentucky Administrative Regulations in no way guide or circumscribe the conduct of Defendant Jockey Club, and accordingly, the Jockey Club is not a "regulated entity" in any true sense of the word. It is therefore

less than clear that Plaintiff can establish state action with reference to the close nexus test, which has traditionally been applied solely to "regulated" private entities. *See Jackson*, 419 U.S. at 351 (electric company regulated by Public Utility Commission); *Blum*, 457 U.S. at 994-95 (nursing homes federally regulated with respect to Medicaid patients); *Sullivan*, 526 U.S. at 52 (insurance company subject to state regulation); *Bier*, 717 F.2d at 310 (racing facility licensed by state); *Fitzgerald*, 607 F.2d at 592 (same); *Crissman*, 289 F.3d at 234 (same). Here, Defendant Jockey Club's approval and registration of thoroughbred names is more properly classed a private action "with the mere approval or acquiescence of the State," insufficient to establish state action. *See Sullivan*, 526 U.S. at 52.

At any rate, assuming that the close nexus test does apply to private entities not subject to state regulation, "extensive regulation does not, in itself, transform otherwise private actions into state action for purposes of § 1983." *See Bier*, 717 F.2d at 311. The close nexus test requires something more. Where a § 1983 litigant challenges private conduct, the state must have "intimately involved" itself in that conduct in such a way as to render it conduct "under color of" law. *See Bier*, 717 F.2d at 311. The purportedly unconstitutional act here is Defendant Jockey Club's refusal to register the Filly with the name "Sally Hemings," which, if given effect by Defendant KHRA, results in exclusion of the Filly from thoroughbred races in the Commonwealth. Plaintiff does not allege that Defendant KHRA participated directly in the decision to deny Plaintiff's application to name the Filly "Sally Hemings." Nor could he since Defendant KHRA plays no part in registering thoroughbred names with Defendant Jockey Club, and at no point sits in review of Defendant Jockey Club's determinations. Furthermore, Plaintiff does not allege that Defendant Jockey Club's officers and stewards are drawn from the ranks of the Commonwealth's horse racing officials, or that the two

entities are in anyway pervasively entwined in membership or function. *Cf. Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (finding regulatory activity of a state-wide interscholastic athletic association akin to state action because "[t]he nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings"). On the facts alleged by Plaintiff, the KHRA did not "intimately involve" itself in the challenged act of approving thoroughbred names.

It is true that Defendant KHRA's regulations generally require thoroughbred horses to be registered and named in the registry office of Defendant Jockey Club. 810 Ky. Admin. Regs. 1:012, §1. Defendant Jockey Club adheres to its *Stud Book Rules* in approving and rejecting thoroughbred names. (J.A. at 8) Neither the Commonwealth's regulations nor the *Stud Book Rules* provide for appeal to any administrative or judicial body of the Commonwealth. Rather, the only mode to challenge Defendant Jockey Club's refusal to approve a requested name is by internal appeal to the Board of Stewards of the Jockey Club. (*See id*. at 9, 29-34) By requiring registration with Defendant Jockey Club, KHRA effectively embraces the *Stud Book Rules* and, if KHRA permitted those rules to govern its behavior, they would effectively become state rules. *Cf. NCAA v. Tarkanian*, 488 U.S. 179, 194 (1988). Yet, this does not transform Defendant Jockey Club into a state actor.

The Supreme Court's pronouncement in *NCAA v. Tarkanian* proves instructive on this point. There, a state university suspended the plaintiff, a basketball coach, in response to an NCAA report detailing multiple violations of NCAA rules. *Tarkanian*, 488 U.S. at 180-81. The court considered whether the state university's "actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id*. at 193. Although the state university participated

25

in drafting the NCAA rules, the state itself was not the source of those rules. *Id*. at 194. Notwithstanding the private nature of the rules, "[s]tate action . . . might lie if [the state university], by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Id*. The *Tarkanian* court concluded that the state university "engaged in state action when it adopted the NCAA's rules to govern its own behavior," but the NCAA was not a state actor merely because it had formulated the disciplinary rules. *Id*. The court noted that the state university "retained the authority to withdraw from the NCAA and establish its own standards." *Id*. at 194-95.

In the instant case, as in *Tarkanian*, the Commonwealth played no part in drafting the *Stud Book Rules* for naming thoroughbreds. However, the Commonwealth allegedly embraced Defendant Jockey Club's *Stud Book Rules* for naming thoroughbreds and gave effect to those rules by denying the Filly entry into thoroughbred races for lack of a registered name. *See Tarkanian*, 488 U.S. at 194. KHRA's implicit adoption of the *Stud Book Rules* did not transform the Jockey Club into a state actor simply by force of its role as author of the *Stud Book Rules* and keeper of the Registry. *See id*. Moreover, KHRA quite obviously retained the authority to amend its regulations to exclude reference to the Jockey Club, or to promulgate its own guidelines for the registration and naming of horses. *See id.* at 194-95. Thus, Plaintiff cannot show Defendant Jockey Club acted under color of law under the close nexus theory.

Finally, Plaintiff claims the Commonwealth of Kentucky "granted a state monopoly to The Jockey Club regarding the registration of Thoroughbreds and the recording of names." (Def.'s Br. at 32) This argument is unavailing. In *Jackson*, the Supreme Court, in dicta, said "[i]t may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be 'state acts than will the acts of an entity lacking these

characteristics." *Jackson*, 419 U.S. at 350-51. As previously discussed, Defendant Jockey Club is not a "heavily regulated utility" and, indeed, is not subject to regulation by the Commonwealth at all. What is more, *Jackson* went on to say that the inquiry must look to whether a close nexus exists. *Id*. at 351. Thus, Plaintiff's attempt to attribute state action to Defendant Jockey Club on a monopoly-status theory must also fail.

Up until this point, I have solely examined the question of whether the Jockey Club acted under the color of law for purposes of § 1983. All parties to this appeal, Defendant KHRA included, focused the state action inquiry on Defendant Jockey Club, as did the district court below; indeed, Plaintiff's complaint asserted a § 1983 claim only against Defendant Jockey Club. However, inasmuch as Plaintiff alleged that Defendant KHRA violated his constitutional rights as well, I now turn my attention to Defendant KHRA. I construe Plaintiff's complaint liberally to allege that KHRA denied the Filly entry into races within the Commonwealth and, therefore, conclude that state action lies for purposes of Plaintiff's constitutional claims against KHRA.

Defendant KHRA, as an administrative agency of the Commonwealth, is a state actor. *See Pennsylvania v. Bd. of Dirs. of City Trusts of Phila.*, 353 U.S. 230, 231 (1957). The regulatory scheme created by KHRA is unquestionably the product of state action. *See Lugar*, 457 U.S. at 941. These regulations generally require thoroughbred horses to be registered and named with the Jockey Club prior to racing in the Commonwealth, but they also set forth a limited exception for horses who gain the approval of the racing stewards for a discretionary waiver. *See* 810 Ky. Admin. Regs. 1:012, § 1. As previously noted, the regulations do not establish guidelines for the Jockey Club to follow in reviewing horse names, KHRA officials do not participate in the Jockey Club's decisions, and neither KHRA nor the Commonwealth itself sits in review of those decisions. To the extent that

the challenged conduct is Defendant Jockey Club's refusal to approve Plaintiff's requested name for the Filly, it cannot fairly be ascribed to KHRA. *See Blum*, 457 U.S. at 1004 ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.").

Nevertheless, I do not doubt that state action lies when KHRA denies entry in its races to a thoroughbred horse because the Jockey Club refused to register the horse's name. *See Tarkanian*, 488 U.S. at 194 ("State action nonetheless might lie if UNLV, by embracing the NCAA's rules, transformed them into state rules."); *see also Bailey*, 550 F.2d at 1019 ("Any defect in the [standards of a private organization where adopted by the State] may translate into a defect in the State system."). As a regulatory body empowered with state authority, such direct conduct clearly constitutes state action. Reading Plaintiff's complaint liberally, as this Court must do on appeal from a motion to dismiss, Plaintiff sufficiently alleged that KHRA denied the Filly entry into thoroughbred races within the Commonwealth due and owing to Defendant Jockey Club's refusal to approve Plaintiff's requested name. (*See* Pl.'s Comp. at ¶¶ 57, 58, 79, 85) Plaintiff's complaint therefore alleged sufficient facts to show that KHRA embraced the Jockey Club's rules in such a way to "transform[] them into state rules," satisfying the state action requirement with respect to Defendant KHRA. *See Tarkanian*, 488 U.S. at 194.

Consequently, on the facts alleged, as read in concert with the statutes and regulations of the Commonwealth of Kentucky, I conclude that Plaintiff failed to show that Defendant Jockey Club acted under color of law. The district court therefore correctly dismissed Plaintiff's federal constitutional challenges against Defendant Jockey Club for lack of state action. With respect to

Defendant KHRA, I would find state action. Nevertheless, because Plaintiff's complaint failed to state a claim that Defendant KHRA violated his constitutional rights, I join in the judgment. I find it unnecessary to join in the majority's discussion of Plaintiff's several federal constitutional challenges, and thus refrain from doing so.

**Rogers, J., concurring.** I agree that Redmond's complaint does not state facts that support a claim for relief, and I concur in the majority opinion. I write separately, however, to explain my understanding that we are not ruling in such a way as to preclude entirely the possibility of a First Amendment claim based on a state's acceptance of a private actor's disallowance of a horse name. If, for instance, Kentucky contracted with a private horse-naming entity that permitted names insulting one political party but not another, a First Amendment claim might well be stated. There is, however, nothing like that alleged in this case.

As a preliminary matter, it appears that the KHRA is a state actor when it accepts the horse-naming determinations of a private contractor, as explained in Judge Clay's concurrence. Moreover, it is unlikely that there is state action on the part of the Jockey Club, also for the reasons set forth in Judge Clay's concurrence. In the end, however, the failure of plaintiff to state a First Amendment claim against either defendant makes it unnecessary for me to decide whether the Jockey Club is a state actor.

In a heavily-regulated industry like horse racing, the state may insist that racehorses have nonduplicative names. This can certainly be done by the state's reserving the right to approve or reject names, on its own or by contract with a private enterprise. Once the state is (legitimately) in the position of approving or rejecting names, the state may validly seek to associate itself only with names that are not offensive or in bad taste. This is no different from the government's support of an art museum while retaining the right not to fund highly offensive exhibits. Similarly, the government could commission a statue of a statesman for a public square, while reserving the right to reject an offensive treatment of the personage. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 583-84 (1998). Considered this way, the state's refusal (or acceptance of its private

contractor's refusal) to approve a particularly offensive name, without more, does not, in my view, state a First Amendment claim.

Nothing keeps the horse owner, or any other private person, from informally using an alternate name for the horse. Indeed, Kentucky's most famous horse, Man o' War, was nicknamed "Big Red." *See, e.g.*, Page Cooper & Roger L. Treat, *Man O' War* 10 (Westholme Publishing, LLC 2004) (1950). Such freedom on the part of private actors would extend to highly offensive names. Similarly, highly-offensive statuary can be sculpted and displayed by private actors.

It might be, however, that certain government naming decisions, or some standards or procedures used in making those decisions, might conceivably trench on First Amendment concerns. Nothing remotely reaching that level has been alleged in this case, however.

In particular, this case involves the state's rejection of a government sanction for identifying a horse with the distinct name of a historical figure who was an African-American slave. One could reasonably expect that giving such a name to a chattel animal would be deeply and singularly offensive to African-Americans, in a way that "Jefferson's Secret," for instance, would not. If plaintiff has a First Amendment right to government approval of the name in question in this case, it is hard to imagine what name would not be permitted. This cannot be the law.

There is, moreover, no sufficiently alleged due process violation. As a matter of procedural due process, assuming that Redmond has a liberty or property interest, he does not allege that the Jockey Club denied him notice of or an opportunity to be heard with respect to its decision, nor does he allege that the Jockey Club was somehow impermissibly impartial. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950); *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973). Instead, Redmond simply alleges that "the denial of Mr. Redmond's right to use the name 'Sally

Hemings' is arbitrary and irrational and serves no legitimate state interest." JA 19 (¶ 69). It is even more obvious that there is no substantive due process violation alleged in this case. "The contention that the [state actor's] actions were arbitrary or capricious cannot be sufficient; otherwise judicial review for compliance with substantive due process would become the equivalent of a typical state or federal Administrative Procedure Act." *Bell v. Ohio State*, 351 F.3d 240, 251 (6th Cir. 2003).